# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-1054

_____

Mathias Njang Etchu-Njang,       *
                                        *

          Petitioner,             *

                                        *    Petition for Review of an

      v.                              *    Order of the Board of

                                        *    Immigration Appeals.

Alberto Gonzales, Attorney General    *

of the United States of America,[1]      *
                                        *

         Respondent.           *

_____

Submitted: December 16, 2004
Filed: April 8, 2005

_____

Before WOLLMAN, MAGILL, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Mathias Njang Etchu-Njang petitions for review of an order of the Board of Immigration Appeals ("BIA") denying his claims for asylum, cancellation of removal, and withholding of removal. We deny the petition for review.

_____

[1]Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Alberto Gonzales is automatically substituted for his predecessor, John Ashcroft, as respondent.

## I.

Etchu-Njang is a native and citizen of Cameroon who last entered the United States on September 27, 1989. When he entered the country in 1989, he had obtained a valid student visa which authorized him to remain in the United States while he studied at Metropolitan State University in Minneapolis, Minnesota. In 1993, while still a student, he applied for asylum, but his application was not granted. In 1998, the Immigration and Naturalization Service[2] charged Etchu-Njang with removability for failure to comply with the conditions of his nonimmigrant status, alleging that he had been working since 1987 without authorization and that he had ceased his studies at the university in 1997. Etchu-Njang conceded removability but requested cancellation of removal pursuant to 8 U.S.C. § 1229b(b) and withholding of removal pursuant to 8 U.S.C. § 1231(b)(3)(A), and also renewed his application for asylum, filed under 8 U.S.C. § 1158(a).

At a hearing before an immigration judge ("IJ"), Etchu-Njang testified that since arriving in Minnesota, he had joined a political party known as the "SDF," which opposed the ruling party in Cameroon. Although he had never held an office or participated in any demonstrations with the organization, he testified that he feared a return to Cameroon because his father and one of his brothers had also belonged to the SDF and were missing or dead "as a result of [their] party affiliation and activities." (A.R. at 238, 240, 270). In support of his application for cancellation of removal, Etchu-Njang also testified that his daughter, a United States citizen, would suffer extreme hardship if his application were denied because she could be subjected to female genital mutilation, and because her anemic condition required her to take iron supplements.

---

[2]Pursuant to the Homeland Security Act of 2002, the functions of the Immigration and Naturalization Service were transferred to the newly-formed Department of Homeland Security ("DHS"). Pub. L. No. 107-296 (2002).

On January 8, 1999, the IJ denied Etchu-Njang's applications for asylum, withholding of removal, and cancellation of removal, but granted the maximum period for voluntary departure. The IJ first registered "some very serious concerns about the overall credibility of the respondent's case." (A.R. at 180). The IJ then found that Etchu-Njang had failed to establish a well-founded fear of future persecution because he had been only minimally involved in activities opposing the government of Cameroon, and because there was insufficient objective evidence showing that his brother and father were involved with the SDF in Cameroon and were subjected to persecution on account of their membership. (A.R. at 183-85). Regarding the application for cancellation of removal, the IJ accepted that Etchu-Njang met the statutory requirements for good moral character and continuous physical presence in the country, but found that he had failed to establish "exceptional and extremely unusual hardship" to his daughter. Although he had considered the evidence relating to female genital mutilation, the IJ determined that the record did not support the conclusion that Etchu-Njang's daughter would actually be subjected to that practice.

Etchu-Njang appealed his case to the BIA, arguing that the IJ erred in denying cancellation of removal and asylum. In December 2002, the BIA declined to affirm summarily the IJ's adverse credibility determination, but affirmed without opinion the IJ's ultimate decision denying the applications for relief. In September 2003, the Department of Homeland Security moved the BIA to reissue its decision with a new decision date and to re-serve the decision to Etchu-Njang's address, after discovering that Etchu-Njang's first attorney had forged the name of another attorney on pleadings filed with the BIA. Etchu-Njang, then represented by a second attorney, also moved the BIA to re-date and reissue its decision, citing the first attorney's misconduct and the fact that he had been sanctioned by the Minnesota Supreme Court. The Board reissued its decision on December 10, 2003.

Etchu-Njang then filed a timely petition for review. In April 2004, the DHS removed Etchu-Njang to his native country. Now represented by a third attorney, he raises for the first time an argument that he was deprived of liberty without due process of law in violation of the Fifth Amendment, because his first counsel was ineffective in developing his claim for cancellation of removal. He also argues that the BIA erred in denying his application for asylum.

II.

We consider first Etchu-Njang's claim that the BIA erred in denying him asylum as a "refugee." Under the Immigration and Nationality Act ("INA"), the Attorney General has discretion to grant asylum to a "refugee," that is, an alien who is unable or unwilling to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); *see* 8 U.S.C. § 1158(b)(1). A "well-founded fear" is one that is both subjectively genuine and objectively reasonable. *Cigaran v. Heston*, 159 F.3d 355, 357 (8th Cir. 1998); *see INS v. Cardoza-Fonseca*, 480 U.S. 421, 430-31 (1987). Congress provided that the Attorney General's discretionary judgment whether to grant relief under the asylum provisions "shall be conclusive unless manifestly contrary to the law and an abuse of discretion." 8 U.S.C. § 1252(b)(4)(D). The BIA's findings of fact are conclusive "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992).

We are not persuaded that the evidence presented by Etchu-Njang would compel any reasonable adjudicator to conclude that he had a well-founded fear of persecution if returned to Cameroon. Etchu-Njang testified that he feared future persecution because of his membership in the SDF, a party that opposes the current government. He acknowledged, however, that he had not even been a member of the

SDF while he was living in Cameroon, and that once he joined the party in Minnesota, his membership was limited to paying dues and attending meetings. We do not believe it was unreasonable for the BIA to conclude that this limited activity was insufficient to create a well-founded fear of persecution.

Etchu-Njang also testified that he feared persecution based on the political activities of his brother and father, whom he claimed had been persecuted by the government of Cameroon. According to Etchu-Njang, his father disappeared as a result of his political activity, and his brother was beaten in prison and later killed. As the IJ noted, however, there was no proof presented from the SDF itself that the brother and father were even involved in the organization. The only evidence submitted on this point was Etchu-Njang's own testimony, and his testimony was undermined by the fact that an INS investigation found no record of the father's membership in the SDF in Cameroon. Etchu-Njang presented a death certificate for his brother and claimed that his brother was beaten to death by government officials, but the certificate indicated that the brother died from injuries in a "road accident." The only evidence in support of Etchu-Njang's claim that his brother was beaten was his own belief, based on reports from his other brother. We do not think this evidence was so strong that any reasonable factfinder would be compelled to conclude that the brother and father were persecuted on account of their membership in the SDF, and that Etchu-Njang himself was therefore threatened with similar persecution. We thus cannot say that the IJ's decision was manifestly contrary to law and an abuse of discretion. *See* 8 U.S.C. § 1252(b)(4)(D).

### III.

Etchu-Njang also contends that he was deprived of liberty without due process of law in violation of the Fifth Amendment, because his counsel performed deficiently in developing what Etchu-Njang believes was a meritorious claim for cancellation of removal. The INA precludes judicial review of the Attorney General's

judgment denying requests for cancellation of removal, 8 U.S.C. § 1252(a)(2)(B)(i), *Halabi v. Ashcroft*, 316 F.3d 807, 808 (2003) (per curiam), but Etchu-Njang contends that we have jurisdiction to review a constitutional claim based on his alleged ineffective assistance of counsel. *See Halabi*, 316 F.3d at 808 (considering alleged constitutional due process claim); *Onyinkwa v. Ashcroft*, 376 F.3d 797, 799 n.1 (8th Cir. 2004) (citing cases from other circuits).

"Our court has yet to recognize the validity of a due-process claim in a deportation proceeding based on the ineffective assistance of counsel." *Nativi-Gomez v. Ashcroft*, 344 F.3d 805, 808 n.1 (8th Cir. 2003). The government argues that an alien has no constitutional right to effective assistance of counsel in removal proceedings, but seems to assume in light of *Halabi* that if there were a "substantial constitutional challenge" that was properly presented, then we would have jurisdiction to review it. *Cf. Calcano-Martinez*, 533 U.S. 348, 350 n.2 (2001); *Lukowski v. INS*, 279 F.3d 644, 646-47 (8th Cir. 2002). The government also contends, however, that whatever the merits of the due process claim, we lack jurisdiction to consider it for a different reason – because Etchu-Njang has not exhausted his administrative remedies. The INA provides that a court may review a final order of removal only if "the alien has exhausted all administrative remedies available to the alien as of right." 8 U.S.C. § 1252(d)(1). The government argues that this statute prevents us from considering Etchu-Njang's ineffective-assistance argument, because it was not raised before the BIA.

If we were starting from scratch, there would be reason to question whether § 1252(d)(1) by its terms precludes a court of appeals from considering issues that an alien did not present to the agency. The Supreme Court has distinguished between exhaustion of administrative *remedies* and the requirement of administrative *issue* exhaustion, and held that a litigant may exhaust his administrative *remedies* by pursuing all available stages of review within the administrative process, even if some *issues* are never raised before the agency. *See Sims v. Apfel*, 530 U.S. 103, 107

(2000). While some statutes governing judicial review of administrative agency decisions explicitly require exhaustion of issues, *e.g.*, 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances"), the exhaustion requirement of § 1252(d)(1) does not do so by its terms. Interpreting similar statutory language in the context of federal habeas corpus review, the Supreme Court has held that a prisoner technically may have "exhausted the remedies available in the courts of the State," 28 U.S.C. § 2254(b)(1)(A), even if he defaulted certain claims by failing to raise them in the state courts. *E.g.*, *Coleman v. Thompson*, 501 U.S. 722, 732 (1991).

By analogy to § 2254(b) and consistent with the distinction between exhaustion of remedies and issues discussed in *Sims*, the plain language of § 1252(d)(1) could be read to require only exhaustion of *remedies* available as of right. *See Sousa v. INS*, 226 F.3d 28, 31 (1st Cir. 2000). Under that reading, Etchu-Njang technically has satisfied the statute. He appealed the IJ's decision to the BIA before petitioning for judicial review, and although he did not file a motion to reopen proceedings after the BIA reissued its final decision in December 2003, *see* 8 C.F.R. § 1003.2(c)(2), we held under a predecessor statute that a motion to reopen is not required to exhaust "remedies available as of right." *White v. INS*, 6 F.3d 1312, 1315 (8th Cir. 1993).

But we do not start from scratch. Prior to enactment of § 1252(d)(1) as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), the INA included a similar exhaustion requirement providing that an order of deportation "shall not be reviewed by any court if the alien has not *exhausted the administrative remedies available to him as of right* under the immigration laws and regulations . . . ." 8 U.S.C. § 1105a(c) (1994) (emphasis added). At least seven circuits, including ours, read former § 1105a(c) to require an alien to exhaust both remedies *and* issues before the agency, albeit without much analysis of the potential distinction between the two. *Margalli-Olvera v. INS,* 43 F.3d 345, 350 (8th Cir.

1994); *Mojsilovic v. INS*, 156 F.3d 743, 748-49 (7th Cir. 1998); *Perkovic v. INS*, 33 F.3d 615, 619 (6th Cir. 1994); *Asencio v. INS*, 37 F.3d 614, 615-16 (11th Cir. 1994); *Ravindran v. INS*, 976 F.2d 754, 761 (1st Cir. 1992); *Pierre v. INS*, 932 F.2d 418, 421 (5th Cir. 1991); *Vargas v. INS*, 831 F.2d 906, 907-08 (9th Cir. 1987).

In considering the meaning of § 1252(d)(1), which reenacted the key language from § 1105a(c) without change, it is "appropriate to assume that our elected representatives, like other citizens, know the law," *Cannon v. Univ. of Chicago*, 441 U.S. 677, 696-97 (1979), and to recognize that "longstanding acceptance by the courts [of a judicial interpretation], coupled with Congress' failure to reject that interpretation, argues significantly in favor of accept[ing] it." *Gustafson v. Alloyd Co., Inc.,* 513 U.S. 561, 602 (1995) (internal quotation omitted) (alteration in original); *see also Sutherland Statutory Construction* § 22:33, at 399 (6th ed. 2002) ("[T]he legislature is presumed to know the prior construction of the original act, and if words or provisions in the act or section amended that had been previously construed are repeated in the amendment, it is held that the legislature adopted the prior construction of the word or provision."). Whatever the merits of the textual interpretation of § 1105a(c) by the courts prior to the IIRIRA, there is a strong inference that in reenacting the same exhaustion language, Congress intended to continue a statutory requirement that an alien exhaust not only remedies, but also issues, before he may obtain judicial review. *Cf. Boudaguian v. Ashcroft*, 376 F.3d 825, 827 (8th Cir. 2004). Often relying on that inference, six circuits have held that § 1252(d)(1) does indeed require issue exhaustion. *Ramani v. Ashcroft,* 378 F.3d 554, 559-60 (6th Cir. 2004); *Xie v. Ashcroft,* 359 F.3d 239, 245 n.8 (3d Cir. 2004); *Barron v. Ashcroft,* 358 F.3d 674, 678 (9th Cir. 2004); *Fernandez-Bernal v. Attorney General,* 257 F.3d 1304, 1317 n.13 (11th Cir. 2001); *Sousa v. INS*, 226 F.3d at 31-32; *Singh v. Reno,* 182 F.3d 504, 511 (7th Cir. 1999); *Witter v. INS*, 113 F.3d 549, 554 (5th Cir. 1997). We consistently have required issue exhaustion in post-IIRIRA immigration cases, and referred to the rule as "jurisdictional," although we have not tied the requirement to § 1252(d)(1). *See Gebremaria v. Ashcroft*, 378 F.3d 734, 736

n.4 (8th Cir. 2004); *Afolayan v. INS*, 219 F.3d 784, 788 (8th Cir. 2000); *Feleke v. INS*, 118 F.3d 594, 600 (8th Cir. 1997).

In the end, however, we do not believe it makes any difference in this case whether § 1252(d)(1) itself requires issue exhaustion. Even where no statute requires it, there is a basic principle of administrative law that "[o]rdinarily an appellate court does not give consideration to issues not raised below." *Hormel v. Helvering*, 312 U.S. 552, 556 (1941); *accord Sims*, 530 U.S. at 112 (O'Connor, J., concurring) (noting unanimity of Court that "[i]n most cases, an issue not presented to an administrative decisionmaker cannot be argued for the first time in federal court"); *United States v. L.A. Tucker Truck Lines*, 344 U.S. 33, 36-37 (1952). This principle ensures that parties have "the opportunity to offer all the evidence they believe relevant to the issues which the trial tribunal is alone competent to decide," and avoids the possibility that litigants will be "surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence." *Hormel*, 312 U.S. at 556. And because agency decisions often are discretionary or require expertise, the doctrine of issue exhaustion serves the salutary purpose of giving the agency an opportunity to address the disputed issue in the first instance. *Cf. McKart v. United States*, 395 U.S. 185, 194 (1969); *cf. also O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (explaining that to prevent habeas litigants from evading the statutory requirement that they exhaust administrative *remedies*, the Court has developed the doctrine of procedural default, which asks "not only whether a prisoner has exhausted his state remedies, but also whether he has *properly* exhausted those remedies, *i.e.*, whether he has fairly presented his claims to the state courts").

Where the parties are "expected to develop the issues in an adversarial administrative proceeding," *Sims*, 530 U.S. at 109, there is a strong rationale for a court-imposed issue exhaustion requirement. While the Court held that issue exhaustion was not required in the inquisitorial Social Security benefit proceedings at issue in *Sims*, removal proceedings before the DHS generally are adversarial and

employ many of the same procedures used in Article III courts. *Cf. Detroit Free Press v. Ashcroft*, 303 F.3d 681, 698 (6th Cir. 2002) (noting, in case involving claimed public right to access to deportation hearings, that because of notice requirements, procedural protections, the rights afforded during the proceedings, and the neutral role of the IJ, removal proceedings "bear a strong resemblance to judicial trials").

There are no other concerns here that militate against application of an issue exhaustion requirement, and there are good reasons to require it. Ineffective assistance of counsel claims are highly fact-specific, and review of such a claim requires the development of a factual record before it is considered by a court of appeals. *See, e.g., United States v. Payton*, 168 F.3d 1103, 1105 n.2 (8th Cir. 1999). If an alien's counsel is ineffective, then the BIA, as the Attorney General's delegate for deciding removal cases, is best positioned to determine in the first instance whether the ineffective counsel may have affected the outcome of the proceeding. It is therefore appropriate to require an alien to present a claim of ineffective assistance of counsel to the BIA, so that the agency may receive evidence, if warranted, and evaluate the claim before the judiciary is called upon to render an opinion. Our conclusion is consistent with the view of many other circuits that an alien must present a claim of ineffective assistance to the BIA, either on direct administrative appeal or in a motion to reopen, before he may obtain judicial review of the claim. *See Goonsuwan v. Ashcroft*, 252 F.3d 383, 390 (5th Cir. 2001); *Bernal-Vallejo v. INS*, 195 F.3d 56, 64 (1st Cir. 1999); *Akinwunmi v. INS*, 194 F.3d 1340, 1341 (10th Cir. 1999) (per curiam); *Stewart v. INS*, 181 F.3d 587, 596 (4th Cir. 1999); *Arango-Aradondo v. INS*, 13 F.3d 610, 614 (2d Cir. 1994); *Castaneda-Suarez v. INS*, 993 F.2d 142, 144-45 (7th Cir. 1993); *Dokic v. INS*, 899 F.2d 530, 532 (6th Cir. 1990) (per curiam); *Roque-Carranza v. INS*, 778 F.2d 1373, 1374 (9th Cir. 1985).

The only potentially relevant distinction we can see between a statutory issue exhaustion requirement arising from § 1252(d)(1) and a court-imposed requirement is that statutory requirements often are "jurisdictional," *Sims*, 530 U.S. at 108; *Barron v. Ashcroft,* 358 F.3d at 678; *but cf. Chelette v. Harris*, 229 F.3d 684, 687-88 (8th Cir. 2000), while court-imposed issue exhaustion requirements are not, *Sims*, 530 U.S. at 106 n.1, and the latter are more likely to be subject to exceptions in particular circumstances. *See Hormel*, 312 U.S. at 557; *Rafeedie v. INS*, 880 F.2d 506, 526 (D.C. Cir. 1990) (R.B. Ginsburg, J., concurring); *id*. at 532-34 (Silberman, J., dissenting). Etchu-Njang argues that issue exhaustion should be excused in this case because his ineffective assistance of counsel claim did not come to light until after he had filed a petition for judicial review and retained a third attorney, at which point it was too late for him to raise this issue before the BIA.

Assuming for the sake of argument that there may be exceptions to the issue exhaustion requirement, we do not agree that an exception could be justified in this case. Etchu-Njang was represented by a second attorney after the first attorney withdrew from the case, and the second attorney was aware by no later than September 2003 that the first attorney had forged another attorney's name on pleadings in this case, and had been sanctioned by the Minnesota Supreme Court. (A.R. at 13). This information gave Etchu-Njang and his second attorney sufficient cause to obtain a transcript and review the record to determine whether the first attorney, in addition to forging signatures and suffering disciplinary sanctions, had performed deficiently in this case. A motion to reopen after the reissued decision would have been timely as late as March 9, 2004, and it seems to us that if the matter had been pursued diligently, the claim of ineffective assistance could have been presented to the BIA by the second attorney in a timely motion to reopen. *See Lata v. INS*, 204 F.3d 1241, 1245-46 (9th Cir. 2000).[3] The BIA has developed procedures

---

[3]The government does not assert that Etchu-Njang's unopposed motion to reissue the BIA's decision would constitute a first "motion to reopen" under 8 C.F.R.

-11-

to consider motions to reopen based on claims of ineffective assistance of counsel, *Matter of Lozada*, 19 I. & N. Dec. 637 (BIA), and it retains discretion to reopen proceedings at any time. 8 C.F.R. § 1003.2(a). Indeed, the agency has reopened proceedings outside the regulatory time limits to consider claims of ineffective assistance of counsel based on its discretionary authority or on equitable principles. *E.g., In re Devki Nandan Bali*, 2005 WL 649048 (BIA Feb. 2, 2005) (unpublished); *In re Bassel Nabih Assaad*, 23 I. & N. Dec. 553, 563 n.4 (BIA 2003). We are thus not persuaded that there is good reason to excuse the issue exhaustion requirement in this case, assuming there is discretion to do so.

Finally, even if Etchu-Njang could somehow jump over the substantial hurdles blocking the path to the merits of his claim, he ultimately presents no basis to undermine the agency's decision denying his request for cancellation of removal. *See Lukowski*, 279 F.3d at 647 n.1 (limit on subject matter jurisdiction in § 1252 is "not the type of jurisdictional issue that must be decided before addressing the merits of the controversy"). An alien states a constitutional claim under the Due Process Clause of the Fifth Amendment only when he has been deprived of a protected liberty interest. *Obleshchenko v. Ashcroft*, 392 F.3d 970, 971 (8th Cir. 2004). We held in *Nativi-Gomez* that ineffective assistance of counsel in the process of applying for discretionary relief cannot establish a violation of the Due Process Clause, because discretionary relief such as adjustment of status amounts to "a power to dispense mercy," and an alien can have no "constitutionally protected liberty interest in such speculative relief." 344 F.3d at 808 (internal quotation omitted). Cancellation of removal is similarly discretionary, *see* 8 U.S.C. §1229b, so even if petitioner's first counsel was deficient, Etchu-Njang cannot state a claim for a violation of any due process rights. *See Guerra-Soto v. Ashcroft*, 397 F.3d 637, 641 (8th Cir. 2005).

---

§ 1003.2(c), such that a motion to reopen filed after the reissuance of the decision would have been considered a second motion precluded by 8 C.F.R. § 1003.2(c)(2).

For the foregoing reasons, the petition for review is denied.

_____