# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3889

_____

John Ballanger, Jr.,                            *
                                                *
            Appellant,                          *
                                                *    Appeal from the United States
      v.                                        *    District Court for the
                                                *    Southern District of Iowa.
Mike Johanns, Secretary, Department             *
of Agriculture,                                 *
                                                *
            Appellee.                           *

_____

Submitted: April 13, 2007
    Filed: August 1, 2007

_____

Before MELLOY, BOWMAN, and GRUENDER, Circuit Judges.

_____

MELLOY, Circuit Judge.

Plaintiff John Ballanger, Jr. ("Ballanger"), sought judicial review of a ruling by the United States Department of Agriculture ("USDA") in which the USDA found Ballanger converted wetlands for agricultural use in violation of 16 U.S.C. §§ 3801, 3821-24, and thereby became ineligible to receive certain USDA benefits. The matter was fully briefed, argued, and submitted to the district court,[1] and the district court

_____

[1]The Honorable Robert W. Pratt, Chief Judge, United States District Court for the Southern District of Iowa.

refused to disturb the agency's decision. Ballanger appeals, and we affirm the judgment of the district court.

I.     Background

Ballanger lives in Iowa and owns farmland in Schuyler County, Missouri. When Ballanger purchased the Schuyler County farmland, he was told by the seller that it did not contain any wetlands. In 1996, Ballanger used a bulldozer and brush cutting equipment to clear woody vegetation and other plants from approximately five acres of land for conversion to row crop planting. The present case centers on a dispute as to whether Ballanger's actions in clearing the land constituted the conversion of a wetland.

In spring 2002, the Schuyler County Farm Service Agency ("the County FSA") sought a determination from the Natural Resources Conservation Service ("the Conservation Service") that, for the crop year 2000, Ballanger's farm complied with highly erodible land conservation and wetland conservation provisions of the Food Security Act of 1985, codified in part at 16 U.S.C. § 3821. This section provides, generally, that the conversion of wetlands for use in the production of agricultural commodities or the production of agricultural commodities on converted wetlands makes the person taking such actions ineligible for certain USDA benefits. Id. The term "converted wetland" is defined, in relevant part, as:

> wetland that has been drained, dredged, filled, leveled, or otherwise manipulated (including any activity that results in impairing or reducing the flow, circulation, or reach of water) for the purpose or to have the effect of making the production of an agricultural commodity possible
> . . . .

16 U.S.C. § 3801(a)(6)(A).

After two visits to Ballanger's Schuyler County farm in April 2002 and August 2002, the Conservation Service concluded that 5.1 acres of his land qualified as converted wetlands. Ballanger was informed of this decision and appealed it to the Conservation Service. As part of that appeal process, the Conservation Service visited his farm a third time in December 2003. After this third visit, the Conservation Service concluded that 4.5 of the 5.1 acres qualified as converted wetlands. This land had, among other characteristics, hydric soil, hydrophytic vegetation, wetland drainage patterns, and oxidized root channels in the upper twelve inches of soil, which are all characteristics of wetlands. See, e.g., 16 U.S.C. § 3801 (a)(18) (defining the term "wetland" with reference to hydric soils and with reference to saturation levels "at a frequency and duration sufficient to support a prevalence of . . . vegetation typically adapted for life in saturated soil conditions . . .").

Ballanger appealed to the County FSA. Before the County FSA, Ballanger stated that he neither applied for a good faith determination that might have excused his actions nor pursued mitigation of the wetland conversion because he believed such actions would have been an admission or acquiescence in the wetlands determination of the Conservation Service. The County FSA affirmed the Conservation Service's determination that the Schuyler County farm contained 4.5 acres of converted wetlands. Based on the finding that the wetlands were converted to row crop use in 1996, Ballanger was declared ineligible for USDA payments as of crop year 1996. Ballanger had received USDA payments from 2000-2002, and he was ordered to repay the amounts he received, plus interest, for a total amount of $40,316.24.

Ballanger then appealed the County FSA ruling to the USDA's National Appeals Division. The National Appeals Division affirmed, as did a USDA Deputy Director upon Ballanger's subsequent request for a director's review of the determination of the National Appeals Division. Through all the stages of appellate review, Ballanger argued generally that he did not believe the land at issue was a

-3-

wetland and that he did not believe his removal of vegetation effected any change in any wetland function of the land.

Following exhaustion of these successive layers of administrative review, Ballanger challenged the USDA's final action in district court. Before the district court, Ballanger raised the following specific arguments. First, he argued that it was improper for the Conservation Service to rely on data obtained on a visit to his land that occurred outside the growing season. Second, he argued that the Conservation Service failed to follow the wetland determination methodology in effect at the time of the purported conversion. Third, he argued that the Conservation Service must consider whether the removal of vegetation had only a minimal effect on wetland functions before making a wetland violation determination. The district court found that, although Ballanger had taken his case through the required levels of administrative review, he had not raised these three specific issues with the agency. The district court held that, in the context of a wetlands determination, it is not sufficient merely to exhaust administrative remedies. Rather, a litigant must specifically raise before the agency those issues he seeks to litigate in court. Therefore, the district court refused to consider Ballanger's three, unexhausted issues.

Ballanger also raised an argument that he had specifically presented in his administrative appeals, namely, whether the removal of woody vegetation in and of itself qualifies as the "manipulat[ion]" of a wetland as defined in 16 U.S.C. § 3801(a)(6)(A), or whether there must be a showing that the removal of woody vegetation impacted the flow of water. The district court considered and addressed this issue, finding that §§ 3801 & 3821and the USDA regulations interpreting those sections define manipulation of a wetland to encompass the removal of woody vegetation for conversion of land to agricultural use, without the need for a separate showing of impact upon wetland function. See 7 C.F.R. § 12.2(a). Based on these conclusions, the district court affirmed the administrative rulings.

## II. Discussion

### A. Issue Exhaustion

The first question presented for our review is whether, to properly exhaust administrative remedies related to a wetlands violation determination by the USDA, a landowner must specifically raise before the agency all of the issues he or she attempts to raise in federal court, i.e., must the landowner merely exhaust his administrative remedies or must he exhaust his remedies specifically as to each issue?

The controlling Supreme Court precedent on this issue is Sims v. Apfel, 530 U.S. 103 (2000). Sims explains that the need for "issue exhaustion" is, first and foremost, a question of statutory construction and that agencies generally have the power to pass regulations requiring issue exhaustion. Id. at 107-08. Where the relevant statutes and regulations do not clearly require issue exhaustion, however, a court-imposed issue exhaustion requirement may be appropriate. Id. at 108. The basis for a court-imposed issue exhaustion requirement is an analogy between the agency-court relationship and the trial court-appellate court relationship: where the agency proceeding is adversarial, the analogy holds, parties are held responsible for raising issues in a manner similar to litigants in court, and issue exhaustion is required; where the agency proceeding is not adversarial, the analogy doesn't hold, and issue exhaustion is not required. Id. at 108-111.

In Sims, the Court stated that a party's failure to develop an issue before an agency cannot be fairly attributed to the party opposing the agency's action if the nature of the agency proceeding was not adversarial and if the agency itself was responsible for identifying issues and creating a record. Id. at 109-10. This is in contrast to the adversarial model of trial courts where each party must develop the factual bases for its specific claims and raise those specific issues it wishes to preserve for appeal.

-5-

Sims involved a social security proceeding in which an administrative law judge served an investigative role and had an independent duty to develop the record. Id. 110-111 ("Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits, and the Council's review is similarly broad.") (internal citation omitted). As a result, the Court held in Sims that issue exhaustion was not required in the particular setting of a social security appeal. Id. at 111.

Relevant to the present case, no statute or regulation regarding wetlands violations specifically requires issue exhaustion. Accordingly, as in Sims, it is necessary to examine the nature of the agency proceedings. The regulations that describe the hearings and review process before the USDA strongly suggest that the review process is adversarial and that issue exhaustion should be required.

The regulations governing the administrative appeal procedure in this case are found at 7 C.F.R. § 11.2-11.13. These regulations provide that "the National Appeals Division . . . is independent from all other agencies and offices of the [USDA], including [USDA] officials at the state and local level." 7 C.F.R. § 11.2. The regulations provide for informal review or mediation prior to the filing of a formal appeal, id. § 11.5, and, after the filing of an appeal, prohibit ex parte communications between officers or employees of the National Appeals Division and persons having interests in the appeal. Id. § 11.7. The regulations also provide that an appellant or the agency may request a subpoena for the production of witnesses and evidence, id. § 11.8(a)(2), and describe a proceeding that is, in many respects, similar to a trial:

> Any party shall have the opportunity to present oral and documentary evidence, oral testimony of witnesses, and arguments in support of the party's position; controvert evidence relied on by any other party; and question all witnesses. When appropriate, agency witnesses requested by the appellant will be made available at the hearing. Any evidence may

be received by the Hearing Officer without regard to whether that evidence could be admitted in judicial proceedings.

Id. § 11.8(c)(5)(ii). In addition, the regulations expressly place the burden of proof on the appellant to prove "that the adverse decision of the agency was erroneous by a preponderance of the evidence." Id. § 11.8(e).

These characteristics show that the party contesting the agency action, rather than the agency adjudicator, has the duty to develop the record in a process that is adversarial in nature. This is distinct from the inquisitorial nature of the social security proceedings under scrutiny in Sims where the administrative law judge is charged with the duty of developing the record.

We note also that the Court in Sims indicated that issue exhaustion is not, in general, disfavored, and courts should not be overly eager to characterize proceedings as non-adversarial. See Sims, 503 U.S. at 109 ("As we further explained in LA Tucker Truck Lines, [344 U.S. 33, 36-37 (1952)] courts require administrative issue exhaustion 'as a general rule' because it is usually 'appropriate under [an agency's] practice' for 'contestants in an adversary proceeding' before it to develop fully all issues there."). By requiring issue exhaustion at the administrative level, where litigants may introduce evidence and fully develop the record, parties to subsequent court proceedings will not "be 'surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence.'" Etchu-Njang v. Gonzales, 403 F.3d 577, 583 (8th Cir. 2005) (quoting Hormel v. Helvering, 312 US. 552, 556 (1941)). Also, "because agency decisions often are discretionary or require expertise, the doctrine of issue exhaustion serves the salutary purpose of giving the agency an opportunity to address the disputed issue in the first instance." Id.

Finally, and perhaps most importantly, the Eighth Circuit has already applied a rule of issue exhaustion in a case involving a wetlands determination. Downer v.

USDA, 97 F.3d 999, 1005 (8th Cir. 1996).  Downer preceded Sims and the court in Downer did not discuss this issue at length.  One of two alternate holdings in Downer, however, is clear: a general exhaustion of remedies is insufficient in the context of a wetlands determination, and specific issue exhaustion is required:

> Downer states that the wetlands "were obviously created by excavating and/or diking the land to collect and retain water for purposes such as water for livestock."  Downer cites nothing in the record to support his assertion that the wetlands are artificial. In fact, Downer affirmatively states that there is no evidence on the issue in the record before the agency.  His brief states: the "USDA utterly failed to consider or determine whether natural wetlands existed in these areas prior to, or in the absence of, the artificial dugouts.  There is no evidence in the record to address this issue."
>
> This statement dooms Downer's argument for two reasons. *First, it is an admission that he failed to present the point before the agency.*  We need not consider arguments the parties failed to raise before the agency. See Texarkana Metro. Area Manpower Consortium v. Donovan, 721 F.2d 1162, 1164 (8th Cir.1983).
>
> Second, Downer has admitted that he failed to carry his burden of proof.

Downer, 97 F.3d at 1005 (emphasis added).    Prior to Sims, then, the Eight Circuit had held that issue exhaustion is required in circumstances like those of the present case. Sims subsequently stated a general rule that in no way detracts from Downer. Therefore, we conclude that issue exhaustion is required, and we need not address the arguments that Ballanger failed to specifically present to the agency.

### B.  Manipulation of a Wetland

Ballanger did present to the agency the issue of whether the removal of woody vegetation from a wetland is, in and of itself, a "manipulat[ion]" of a wetland for

purposes of 16 U.S.C. § 3801(a)(6)(A) or whether the USDA was required to prove that any such removal of vegetation actually impacted or reduced water flow. Accordingly, we must address this issue.

The relevant statute provides:

> The term "converted wetland" means wetland that has been drained, dredged, filled, leveled, or otherwise manipulated (including any activity that results in impairing or reducing the flow, circulation, or reach of water) for the purpose or to have the effect of making the production of an agricultural commodity possible . . . .

16 U.S.C. § 3801(a)(6)(A). The USDA's regulation addressing this same definition differs slightly from the statutory language, defining a converted wetland as:

> wetland that has been drained, dredged, filled, leveled, or otherwise manipulated (including *the removal of woody vegetation or* any activity that results in impairing or reducing the flow and circulation of water) for the purpose of or to have the effect of making possible the production of an agricultural commodity *without further application of the manipulations described herein* . . . .

7 C.F.R. § 12.2(a) (emphasis added).

The district court determined that the above-quoted parenthetical language from the statute, "including any activity that results in impairing or reducing the flow, circulation, or reach of water," is merely illustrative of the type of activity that might qualify as manipulation of wetland. We agree. By using the term "including" it seems that Congress did not intend to impose a separate or additional requirement that the agency prove an impairment or reduction in "the flow, circulation, or reach of water," 16 U.S.C. § 3801(a)(6)(A), before making a finding that land qualifies as a "converted wetland." See Fed. Land Bank of St. Paul v. Bismark Lumber Co., 314

U.S. 95, 100 (1941) ("[T]he term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principal.").

Ballanger disagrees with this interpretation and argues that the insertion of the italicized language in the regulation represents an impermissible expansion of the statute and an unreasonable interpretation of the statutory language. Although Ballanger's argument that the regulation expands upon the statute is a reasonable argument and a plausible reading of the statute, we believe that he relies too heavily on the statute's illustrative parenthetical to the exclusion of the rest of its text. The district court refused to adopt Ballanger's view of the statute. Instead, the district court properly noted that, without the illustrative parenthetical, the statute defines a converted wetland in functional terms with reference to the effect of making possible the cultivation of crops on the land: "'converted wetland' means wetland that has been drained . . . or otherwise manipulated . . . for the purpose . . . of making the production of an agricultural commodity possible." Gunn v. USDA, 118 F.3d 1233, 1238 (8th Cir. 1997) (quoting 16 U.S.C. § 3801(a)(6)(A)). Read in this manner, the parenthetical in the statute should not be treated as an additional requirement.

Further, read in this manner, the statute is susceptible to the interpretation espoused by the agency, namely, that the removal of woody vegetation from a wetland for the purpose of making the production of a crop possible can be deemed manipulation of the wetland without separate proof of an impact on or reduction in water flow. Whether we, as a matter of first impression, would have interpreted the statute in the same manner as the agency is of no consequence. We must defer to the agency's interpretation of the statute it is charged with enforcing unless that interpretation is contrary to the statute's unambiguous meaning. Fults v. Sanders, 442 F.3d 1088, 1090 (8th Cir. 2006). Similarly, we must defer to the agency's interpretation of its own regulation. See Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) ("Our task is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation

-10-

must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'") (internal citation omitted). And, our overall review of the challenged agency action is deferential, such that we may only disturb agency actions that are, inter alia, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2)(A). Viewed in this light, we cannot say the present regulation is contrary to unambiguous statutory language, that the agency's interpretation of its own regulation is plainly erroneous or inconsistent with the regulation, or that application of the regulation in this case was arbitrary or capricious.

Finally, we note that Ballanger cites a proposed regulation, 67 Fed. Reg. 19699, 19701 (2002), in support of his position that the removal of woody vegetation should not be deemed a manipulation of a wetland without a showing that water flow is impaired. The proposed regulation appears to have been intended to exempt certain actions that might otherwise be deemed the manipulation of a wetland if such actions were taken to restore or improve the natural, "prairie wetland" function of previously degraded wetlands. For example, the proposed regulation stated, "[the] USDA determined that such action, when conducted under specified conditions identified in the proposed rule, will not have a significant impact on wildlife and fish habitat, will enhance the 'prairie wetland' function by returning these areas to a more natural seral stage, and will not otherwise implicate the [wetland conservation] provisions." Id. The proposed regulation further provided that any such exemption would be carefully monitored and controlled, providing that if "cropping is allowed to resume, cropping history will be verified using official USDA records, or in cases where records are not available, photographic evidence or other documentation." Id. Finally, the regulation made clear that it would "apply to the removal of vegetation and stumps in wetlands that have already been significantly degraded, and are farmed, hayed, or grazed." Id.

Ballanger argues this proposed regulation would have excluded the removal of "scattered" woody vegetation from the definition of wetland "conversion." Because this proposed regulation did not become a final rule, we decline Ballanger's invitation

-11-

to treat it as an expression of the agency's interpretation of the statute. Even if we were to consider the proposed regulation, however, it is undisputed that, in this case, Ballanger removed woody vegetation and subsequently farmed land that had not been shown to be otherwise degraded. Ballanger does not attempt to argue that he took actions in order to place the land in a more natural, properly functioning wetland state.

The agency action in this case is entitled to our deference and we will not disturb the finding of a wetlands violation.

The judgment of the district court is affirmed.

_____