[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 9, 2005
THOMAS  K. KAHN
CLERK

No. 04-16507
Non-Argument Calendar
_____

Agency No. A79-414-825

LUAN RAMA,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(September 9, 2005)**

Before HULL, WILSON  and FAY, Circuit Judges.

PER CURIAM:

Luan Rama, through counsel, petitions for review of the reissued order of the Board of Immigration Appeals ("BIA"), affirming without opinion the immigration judge's ("IJ's") denial of asylum and withholding of removal under the Immigration and Nationality Act ("INA"), and relief under the United Nations Convention on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT").[1] Rama argues on appeal that (1) the BIA's summary affirmance of the IJ's decision violated Rama's Fifth Amendment due process rights; (2) the IJ's adverse credibility determination was not supported by substantial evidence; and (3) Rama was denied effective assistance of trial and appellate counsel. For the reasons set forth more fully below, we affirm.[2]

In 2001, Rama, a native and citizen of Albania, attempted to enter the United States, using a false passport that he had purchased in Albania.[3] During an

---

[1] Rama has abandoned by not raising in his petition for review any challenges to the denial of his claims for withholding of removal and relief under the CAT. See Sepulveda v. U.S. Attorney General, 401 F.3d 1226, 1228 n.2 (11th Cir. 2005).

[2] Although Rama's petition for review was not filed within 30 days of the date the BIA's original opinion was entered into the record, the BIA in this case granted Rama's motion to reopen and reissued its original opinion with a new date to allow Rama the opportunity to timely file his petition for review. The parties do not question our jurisdiction, and we have not previously addressed this issue. However, the Seventh Circuit, as persuasive authority, held in Firmansjah v. Ashcroft, 347 F.3d 625 (7th Cir. 2003), that it did have jurisdiction over a timely petition for review from a reissued opinion when the petitioner did not have notice of the BIA's entry of its first opinion. See id. at 627. We also conclude that this petition for review is timely with respect to the BIA's reissued opinion.

[3] Although the Administrative Record does not contain Rama's Notice to Appear ("NTA"), Rama presumptively was subject to removal under INA § 212(a)(7)(A)(i)(I), 8 U.S.C. § 1182(a)(7)(A)(i)(I), as an immigrant who was not in possession of a valid entry document.

interview at the Miami International Airport by an inspector with the Immigration and Naturalization Service (INS),[4] Rama informed this inspector that (1) he was not a United States citizen, (2) his home was in Albania at "Elbasan L. Aqife Pasha # 42," (3) he did not have a phone at home, (4) he was a private driver, (5) he had presented a false passport upon entry, and (6) he had entered the United States "[l]ooking for freedom and to get reunited with [his] family." Following this interview, Rama was paroled into the United States and given the opportunity to apply for asylum and related relief.

Rama, through attorneys Cyrus Bischoff and Antonio Gonzalez, subsequently filed an application for asylum, alleging that Rama had suffered past persecution and had a well-founded fear of future persecution on account of his membership and support of the Democratic Party of Albania ("DP"), which also is referred to as the Legality Movement Party ("LMP"). Rama attached to this application a personal affidavit and copies of his birth certificate, "family certificate," and Albanian passport. In February 2003, at Rama's asylum hearing,

---

Rama also states in his appeal brief, without citing to evidence in the record, that he conceded removability at his initial hearing.

[4] On November 25, 2002, President Bush signed into law the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135. This legislation created a new Department of Homeland Security, abolished the INS, and transferred its functions to the new department. Because this case was initiated while the INS still was in existence, we will refer to the agency as the INS.

Rama was the only witness to testify. Moreover, Rama did not introduce documentary evidence, other than the attachments to his asylum application.

Rama's testimony at this hearing, along with his application and attached affidavit, included the following assertions. Rama was born in Elbasan, Albania, in 1972, during the reign of a communist regime. In 1990, as the communist regime began to crumble, various members of Rama's family joined the DP. In 1995, Rama joined the DP or LMP, which sought the reinstatement of a monarchy in Albania and was in opposition to the Socialist Party ("SP")—the current majority party in Albania. When the SP came to power, in June 1997, it began persecuting members of the DP, based on their political affiliations. Rama further stated that his mother, two brothers, and a sister-in-law came to the United States prior to his arrival in July 2001.[5]

Although Rama testified that his mistreatment as a member of the DP began in 1991, he clarified that he decided to leave Albania and come to the United States primarily based on events that occurred in June and July 2001. These events included that, on June 18, 2001, after he participated in a DP demonstration in the main square of Elbasan, members of the Albanian secret police ("the SHIK") apprehended and detained him for two days, beat him, and ordered him to give up

---

[5] Rama stated during his asylum hearing that two brothers, his father, and his grandmother still were living in Albania in July 2001, but he conceded that his family certificate only included the two brothers who had entered the United States by this date.

4

his political activities. On June 24, 2001, while Rama was supervising a polling place during Albanian elections, he observed members of the SP manipulating the polls and informed them that he intended to report these irregularities. On the following day, SHIK officers came to his home, abducted him, questioned him about these statements, and threatened to kill him if he did not cease his political activities. When Rama stated that he still intended to report the polling irregularities, the officers beat him "very badly" and left him in the street. Rama then went to the hospital, where he received stitches on his face and was treated for bruises and cuts on unspecified parts of his body.[6]

Moreover, on June 30, 2001, after Rama participated in a protest in the main square of Elbasan, he was stopped by two SHIK officers, who, after noting that Rama had not given up his political activities, beat him into unconsciousness. Although this beating resulted in "unbearable" pain, Rama did not testify that he went to a hospital or, otherwise, sought medical treatment. During this same period, Rama also received at home anonymous phone calls from persons he believed were connected with the SHIK. These callers threatened him with death and threatened unidentified members of Rama's family.[7] Rama further testified

---

[6] Rama conceded on cross-examination that he could have, but did not, obtain and submit records that corroborated his party membership and this hospitalization.

[7] When Rama was asked to verify what location he meant by "home," he stated "Elbasan L. Aquife Pasha, No. 42," which was the same home address he had listed in his

that, he did not report these incidents to the authorities or to the human rights organization located in Albania, because he feared such reports would result in him suffering more persecution. Finally, Rama believed that, (1) if he returned to Albania, SHIK officers would resume their attacks on him; and (2) as a well-known organizer of the DP, he could not avoid this persecution by relocating to another part of Albania.

The government, in turn, introduced a copy of the U.S. Department of State's "2001 Profile of Asylum Claims and Country Conditions" ("DOS Profile"), which included that the SHIK had not played a role in domestic Albanian politics since 1996. This DOS Profile also included that citizens of Albania currently were not being targeted for mistreatment based on their political activities, and were more likely to be the victims of "organized and amateur crime," due to poverty, official corruption, and widespread availability of firearms. In addition, the DOS Profile noted that Albania had "a culture of blood feud that [was] wholly independent of political activity." The government also submitted a copy of the U.S. Department of State's "2001 Country Reports on Human Rights Practices in

---

asylum application, and that he had provided to the INS inspector. In addition, when the IJ explained that this statement was inconsistent with Rama's previous statement to an INS inspector that he had no home phone, Rama stated that this inconsistency was due to the fact that the interpreter during this initial interview used a different Albanian dialect, and he, therefore, "didn't exactly understand" the interpreter. The IJ, however, ultimately concluded that this explanation was belied by Rama's concession that the translator accurately translated all of his other answers during this inspection.

Albania" ("Country Reports"), which, similar to the DOS Profile, included a statement that the SHIK was responsible for both internal and external intelligence gathering and counterintelligence. Moreover, this report outlined unconfirmed claims by DP members of mistreatment.

On February 27, 2003, the IJ denied Rama's application for asylum and ordered him removed to Albania. The IJ acknowledged that an asylum applicant may meet his burden solely through his own testimony if his testimony is believable, consistent, and sufficiently detailed. The IJ, however, found that Rama's testimony was not believable. In support of this adverse credibility determination, the IJ cited to the following inconsistencies: (1) Rama testified that he received threatening phone calls at home, while he told the INS inspector on his entry into the United States that he had no phone at home in Albania; (2) Rama testified that these phone calls had included threats involving his family, while he also testified that his family had left Albania by the time that these calls were made; and (3) Rama testified that he worked in a brick factory, while he told the INS inspector that he was a private driver and he included in his asylum application that his only job had been selling groceries.

The IJ further discussed the differences between the DOS Profile and Rama's testimony that the SHIK repeatedly had persecuted him in 2001, based on his political activities. The IJ also found that, even though Rama had been in the

7

United States for over a year by the date of his asylum hearing, and he had the opportunity to obtain corroborating documents, such as records evidencing his DP membership, hospital treatment in June 2001, or mistreatment by the SHIK, he had not submitted any such documents. The IJ, thus, concluded that Rama had not established his eligibility for asylum and denied his claim.

Rama, through different appellate counsel, R. Andrew Brown, appealed the IJ's decision to the BIA, stating only that he "ha[d] met his burden of proof for [a]sylum." Although Rama initially indicated in this appeal form that he would file a separate written brief in support of his appeal, he never submitted one. Rama, instead, filed a motion for remand, seeking to have the application remanded to the IJ for the IJ's consideration of "new evidence," that is, proof that Rama's brother and his parents had been granted asylum based on "claims involving similar and connected facts." As part of this motion, Rama explained that he did not call these family members as witnesses at his prior asylum hearing because, at that time, their testimony only would have been considered cumulative.

On May 14, 2004, the BIA denied this motion for remand, explaining that remand was not necessary because the BIA was not bound by decisions regarding other asylum applicants. A single member of the BIA also summarily affirmed the IJ's decision without opinion, pursuant to 8 C.F.R. § 1003.1(e)(4). Rama did not file a timely petition for review with this Court. However, on August 16, 2004,

Rama, through his third and current counsel, Richard A. Kulics, filed a motion to reopen with the BIA, arguing that he had failed to file a timely petition for review because (1) Rama's second counsel had provided ineffective assistance by not timely informing him of the BIA's opinion, and (2) Rama had not learned of the opinion until July 2004, after his time for petitioning for review of this opinion had expired. Rama also asserted, without providing proof, that he had filed a grievance against Brown with the Florida Bar, and that he, otherwise, had satisfied all of the requirements set forth in Matter of Lozada, 19 I & N Dec. 637, 639 (BIA 1988), regarding motions to reopen based on ineffective assistance of counsel.

On November 17, 2004, the BIA issued an order, concluding that, although Rama's motion to reopen was untimely, pursuant to 8 C.F.R. § 1003.2(c)(2) (2004), the government had not opposed it. The court, therefore, exercised its sua sponte authority under 8 C.F.R. § 1003.2(a) to reopen the case, attached and incorporated its May 2004 order, and explained that this prior decision was "reissued and [should] be treated as entered as of today's date."

**Issue 1:      Whether the BIA's summary affirmance of the IJ's decision violated Rama's Fifth Amendment due process rights**

Rama first argues that the BIA's summary affirmance of the IJ's decision violated his Fifth Amendment due process rights. Rama contends that, by summarily adopting the IJ's reasoning, the BIA "failed to undergo meaningful

9

review of the judgment" of the IJ. Rama asserts that, although the BIA is not required to issue an extensive discussion on every issue raised on appeal, its bare conclusions in his case were inadequate because the IJ's decision was "riddled with errors." Rama also contends that, because he "provided such an extensive, precise and detailed appeal, the minimum the BIA should have done was [to] address the issues present[ed] and explain the rationale behind its decision."

We review constitutional challenges de novo. Lonyem v. U.S. Attorney General, 352 F.3d 1338, 1341 (11th Cir. 2003). "To establish due process violations in removal proceedings, aliens must show that they were deprived of liberty without due process of law, and that the asserted errors caused them substantial prejudice." Id. at 1341-42. Pursuant to 8 C.F.R. § 1003.1(e)(4)(i), a single BIA member shall affirm an IJ's decision, without an opinion, if:

> the Board Member determines that the result reached in the decision under review was correct; that any errors in the decision under review were harmless or nonmaterial; and that
> (A) The issues on appeal are squarely controlled by existing Board or federal court precedent and do not involve the application of precedent to a novel factual situation; or
> (B) The factual and legal issues raised on appeal are not so substantial that the case warrants issuance of a written opinion in the case.

8 C.F.R. § 1003.1(e)(4)(i). Thus, the decision of the IJ becomes the final agency decision. Lonyem, 352 F.3d at 1342 (citing former version of this regulation in 8 C.F.R. § 3.1(a)(7)).

10

Applying this regulation, we have determined that an alien is not entitled per se to a full opinion by the BIA. Id.[8] We explained in Lonyem that, "[t]he fact that a single BIA member issued an affirmance without opinion [did] not demonstrate that he did not review the facts of [the petitioner's] case. Id. We further determined that the petitioner failed to present evidence showing that: (1) the BIA member who reviewed the case deviated from the regulation's requirements when he determined that the case warranted a summary affirmance, or (2) the petitioner was substantially prejudiced by the BIA's issuance of an affirmance without opinion. Id. We concluded, therefore, that the petitioner's due process claims were without merit. Id.; see also Gonzalez-Oropeza v. U.S. Attorney General, 321 F.3d 1331, 1333 (11th Cir. 2003) (rejecting petitioner's constitutional challenge to the BIA's summary affirmance of the IJ's order because the issues were not complex and were governed by existing agency and federal court precedent).

Similar to the facts in Lonyem, Rama has not cited to evidence in the record showing that the BIA failed to follow its regulations. Contrary to Rama's claim that he "provided [] an extensive, precise and detailed appeal," he did not file an appeal brief, and he only stated in his notice of appeal that he "ha[d] met his

---

[8] In reaching it determination in Lonyem, we cited to the Supreme Court's decision in Vermont Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 543, 98 S.Ct. 1197, 1211, 55 L.Ed.2d 460 (1978), that "administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." See Lonyem, 352 F.3d at 1342.

burden of proof for asylum." Moreover, as discussed below, the BIA reasonably could have concluded that this case met the standard for affirmance without opinion, that is, (1) that the IJ either was correct, or that any errors in the decision under review were harmless or nonmaterial; and (2) that the issues on appeal are squarely controlled by existing Board or federal court precedent. See 8 C.F.R. § 1003.1(e)(4)(i). Rama also has failed to explain how he was substantially prejudiced by the summary affirmance. See Lonyem, 352 F.3d at 1342. Thus, we conclude that the BIA's summary affirmance of the IJ's decision did not violate Rama's due process rights.

**Issue 2:** **Whether substantial evidence supports the IJ's adverse credibility determination and finding that Rama failed to demonstrate his eligibility for asylum**

Rama also argues that the IJ denied him a fair asylum hearing by either disregarding or distorting substantial evidence that Rama submitted in support of his asylum application. Rama specifically contends that, in making his adverse-credibility finding, the IJ improperly relied on (1) perceived discrepancies regarding unimportant details, and (2) Rama's failure to produce corroborative evidence. Rama asserts that the IJ erred in relying on the DOS Profile, and in disregarding conflicting statements in the Country Reports, in concluding that he had no reasonable fear of future persecution. Rama also argues that these reports

12

are "sometimes colored by diplomatic relations" and, thus, generally should be treated with "healthy scepticism."

When a single member of the BIA summarily affirms the IJ's decision without an opinion, such as here, the IJ's decision becomes the final removal order subject to review. Mendoza v. U.S. Attorney General, 327 F.3d 1283, 1284 n.1 (11th Cir. 2003). To the extent that the IJ's decision was based on a legal determination, our review is de novo. D-Muhumed v. U.S. Attorney General, 388 F.3d 814, 817 (11th Cir. 2004). On the other hand, the IJ's factual determinations are reviewed under the substantial evidence test, and we "must affirm the [IJ's] decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Al Najjar v. Ashcroft, 257 F.3d 1262, 1283-84 (11th Cir. 2001) (quotation omitted).

"We cannot engage in fact-finding on appeal, nor may we weigh evidence that was not previously considered below." Id. at 1278. A finding of fact will be reversed "only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal . . .." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc), cert. denied, 125 S.Ct. 2245 (2005). A credibility determination also is reviewed under the substantial evidence test; thus, we "will not substitute our judgment for that of the IJ with respect to credibility findings." D-Muhumed, 388 F.3d at 818.

13

An alien who arrives in, or is present in, the United States may apply for asylum.  See INA § 208(a)(1), 8 U.S.C. § 1158(a)(1).  The Attorney General has discretion to grant asylum if the alien meets the INA's definition of a "refugee."  See INA § 208(b)(1), 8 U.S.C. § 1158(b)(1).  A "refugee" is defined as

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . ..

INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A).  "The asylum applicant carries the burden of proving statutory 'refugee' status."  D-Muhumed, 388 F.3d at 818.

To establish asylum eligibility, the petitioner must, with specific and credible evidence, demonstrate (1) past persecution on account of a statutorily listed factor, or (2) a "well-founded fear" that the statutorily listed factor will cause future persecution.  8 C.F.R. § 208.13(a), (b); Al Najjar, 257 F.3d at 1287.  If the petitioner demonstrates past persecution, there is a rebuttable presumption that he has a well-founded fear of future persecution.  See 8 C.F.R § 208.13(b)(1).  If he cannot show past persecution, then the petitioner must demonstrate a well-founded fear of future persecution that is both subjectively genuine and objectively reasonable.  See Al Najjar, 257 F.3d at 1289.  The subjective component can be

14

proved "by the applicant's credible testimony that he or she genuinely fears persecution," while the objective component "can be fulfilled either by establishing past persecution or that he or she has a good reason to fear future persecution." Id. (quotation omitted).

If credible, an alien's testimony may be sufficient to sustain the burden of proof without corroboration. Forgue v. U.S. Attorney General, 401 F.3d 1282, 1287 (11th Cir. 2005). The weaker an applicant's testimony, however, the greater the need for corroborative evidence. Feng Chai Yang v. U.S. Attorney General, No. 03-16068, manuscript op. at 6 (11th Cir. July 29, 2005). Indications of reliable testimony include consistency on direct examination, consistency with the written application, and the absence of embellishments. See In re B-, 21 I & N Dec. 66, 70 (BIA 1995); see also Dailide v. U.S. Attorney General, 387 F.3d 1335, 1343 (11th Cir. 2004) (affirming the BIA's adverse credibility determination, which was based upon its finding that the alien's testimony conflicted with his answers to interrogatories and other documentary evidence).

"Conversely, an adverse credibility determination alone may be sufficient to support the denial of an asylum application." Forgue, 401 F.3d at 1287. However, "an adverse credibility determination does not alleviate the IJ's duty to consider other evidence produced by an asylum applicant." Id. If an applicant produces evidence beyond his own testimony, "it is not sufficient for the IJ to rely solely on

15

an adverse credibility determination in those instances." Id. Furthermore, "the IJ must offer specific, cogent reasons for an adverse credibility finding." Id. (quotation omitted). "Once an adverse credibility finding is made, the burden is on the applicant alien to show that the IJ's credibility decision was not supported by 'specific, cogent reasons[,]' or was not based on substantial evidence." Id. (quotation omitted).

In the instant case, the IJ offered "specific, cogent reasons" for its adverse credibility finding by citing to the following inconsistencies: (1) Rama testified that he received threatening phone calls at home, while he told the INS inspector on his entry into the United States that he had no phone at home in Albania; (2) Rama testified that these phone calls had included threats involving his family, while he also testified that his family had left Albania by the time that these calls were made; and (3) Rama testified that he worked in a brick factory, while he told the INS inspector that he was a private driver and he included in his asylum application that his only job during the previous five years had been selling groceries.

Furthermore, the record reflects that, although Rama included in his asylum application, and testified during the asylum hearing, that he received threatening anonymous phone calls at home immediately before he left Albania in July 2001, he informed the INS inspector on his arrival into the United States that he had no

phone in Albania. When Rama was asked to verify what location he meant by "home," he stated "Elbasan L. Aqife Pasha, No. 42," which was the same home address that he had listed in his asylum application and provided to the INS inspector. Although Rama stated that this inconsistency was due to the fact that he "didn't exactly understand" the interpreter during his interview with the INS inspector because she spoke with a different Albanian dialect, the IJ reasonably concluded that Rama's explanation was belied by his concession that the translator accurately translated all of his other answers during this inspection. In addition, although Rama testified that these phone calls included threats involving his family members, he also testified that his mother, two brothers, and sister-in-law entered the United States prior to his arrival in July 2001.

To the extent Rama also is arguing that the IJ erred in relying on the DOS Profile in making his adverse credibility determination, this argument is not supported by the record. In discussing the discrepancies between the DOS Profile and Rama's testimony that the SHIK repeatedly persecuted him in 2001, based on his political activities, the IJ accurately cited to the finding in the DOS Profile that the SHIK had not had a role in Albania's domestic politics since 1996. Although Rama is arguing that this finding is contradicted by a statement in the Country Reports that the SHIK is responsible for both internal and external intelligence

17

gathering and counterintelligence, this statement is also included and discussed in the DOS Profile.

Furthermore, to the extent the IJ relied on the finding in the DOS Profile that "[t]here is virtually no evidence that individuals are targeted for mistreatment on political grounds," this finding was not per se contradicted by unconfirmed claims of mistreatment by DP members in the Country Reports. Although Rama also generally contends that DOS reports should be treated with "healthy scepticism" he has failed to cite to controlling authority for this argument. In addition, contrary to Rama's argument that these discrepancies involved incidental facts, Rama testified that his decision to leave Albania primarily was based on events that occurred in June and July 2001, which included his alleged confrontations with SHIK officers and subsequent threatening phone calls.

Finally, to the extent Rama's appeal can be construed as arguing that the IJ improperly required him to produce corroborating evidence, as discussed above, if credible, the alien's testimony may be sufficient to sustain the burden of proof without corroboration. See Forgue, 401 F.3d at 1287. However, the IJ only noted that Rama had failed to provide corroborating documents, such as records evidencing his DP membership, hospital treatment, or mistreatment, and only after the IJ explicitly found that Rama's testimony was not credible and that corroborating evidence was necessary for Rama to meet his burden of proof.

18

Moreover, the IJ found that this corroborating evidence was readily available because Rama had been in the United States for over a year by the date of his asylum hearing.[9]  Thus, the IJ's reasons for his adverse credibility determination are supported by substantial evidence.  See D-Muhumed, 388 F.3d at 818.

**Issue 3:**      **If Rama exhausted his administrative remedies, whether he was denied effective assistance of trial and appellate counsel**

Rama last argues that he was denied effective assistance of trial and appellate counsel.  Rama asserts that his trial counsel unreasonably failed to present documentary evidence supporting Rama's testimony during his asylum hearing, or to call as witnesses members of Rama's family who were residing in the United States.  Rama contends that the fact that his family members obtained asylum conclusively showed that he was prejudiced by his trial counsel's failure to question them during his asylum hearing, and that the IJ's decision to deny his application was based primarily on his counsel's failure to offer corroborative evidence.  In addition, Rama argues that he was denied effective assistance of appellate counsel by his appellate counsel's failure to file an appellate brief.

---

[9]  The REAL ID Act of 2005 provides in relevant part that, "[n]o court shall reverse a determination made by a trier of fact with respect to the availability of corroborating evidence . . . unless the court finds . . . that a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable."  See REAL ID Act of 2005,  Pub. L. No. 109-13, Div. B, § 101(e), 119 Stat. 231, 305 (2005).  However, this provision of the REAL ID act is not retroactively applicable to a case, such as this, that was initiated before the implementation of the REAL ID Act on May 11, 2005.  See id.; see also Olujoke v. Gonzalez, 411 F.3d 16, 22 n.4 (1st Cir. 2005) (persuasive authority acknowledging that the REAL ID Act contained new standards for reviewing credibility determinations, but determining that these standards were not applicable to an application for asylum that was filed before the enactment of the REAL ID Act).

As a preliminary matter, the government is arguing that we lack jurisdiction because Rama failed to exhaust his administrative remedies by previously raising his claims of ineffective assistance of counsel. "A court may review a final order of removal only if 'the alien has exhausted all administrative remedies available to the alien as of right.'" Taylor v. United States, 396 F.3d 1322, 1327 (11th Cir. 2005) (quoting 8 U.S.C. § 1252(d)(1)). We have interpreted this exhaustion requirement to be jurisdictional. See Fernandez-Bernal v. Attorney General, 257 F.3d 1304, 1317 n.13 (11th Cir. 2001) (holding that we lacked jurisdiction to review a claim that the petitioner was eligible to apply for discretionary relief because the petitioner did not raise this claim before the BIA); see also Galindo-Del Valle v. Attorney General, 213 F.3d 594, 599 (11th. Cir. 2000) (holding that we lacked jurisdiction to review newly raised challenge to deportation order and arguments that she should have been permitted to apply for asylum and withholding of removal).

Other circuits that have addressed this issue have determined that this exhaustion requirement is applicable to claims of ineffective assistance of counsel. See Etchu-Njang v. Gonzalez, 403 F.3d 577, 583-85 (8th Cir. 2005) (holding that it lacked jurisdiction because the petitioner failed to raise his claim of ineffective assistance of counsel before the BIA, and listing other circuits that have reached similar conclusions). An alien may file one motion to reopen a final administrative

20

order of removal within 90 days of that order. 8 U.S.C. § 1229a(c)(7).[10]

Furthermore, the BIA retains discretion to reopen proceedings at any time. See 8

C.F.R. § 1003.2(a). One of the grounds an alien may claim in a motion to reopen

is ineffective assistance of counsel. Dakane v. U.S. Attorney General, 399 F.3d

1269, 1273 (11th Cir. 2005). Thus, Rama arguably had the opportunity in both his

initial appeal to the BIA and his motion to reopen to raise in the first instance his

claims of ineffective assistance of counsel.

As the government concedes, however, we have not determined whether

§ 1252(d)(1)'s exhaustion requirement is applicable to claims of ineffective

assistance of counsel. Nevertheless, we need not decide this issue in the instant

case because, even assuming we have jurisdiction, Rama both failed to comply

with the requirements set forth in Lozada for raising a claim of ineffective

assistance of counsel, and to establish ineffective assistance of counsel. See Garcia

v. Attorney General of U.S., 329 F.3d 1217, 1223 (11th Cir. 2003) (noting

disagreement between the circuits as to whether a petitioner must exhaust his or

her claim of ineffective assistance of counsel before the BIA before presenting it to

_____

[10] Section 1229a(c)(7) specifically provides that: "[a]n alien may file one motion to reopen proceedings under this section. . . . The motion to reopen shall state the new facts that will be proven at a hearing to be held if the motion is granted, and shall be supported by affidavits or other evidentiary material . . . the motion to reopen shall be filed within 90 days of the date of entry of a final administrative order of removal." See 8 U.S.C. § 1229a(c)(7).

21

this Court, and declining to decide this issue because the petitioner's claim was without merit).

As discussed above, we review de novo an alien's constitutional challenges. Lonyem, 352 F.3d at 1341. Section 1362 of the INA provides that:

> In any removal proceedings before an [IJ] and in any appeal proceedings before the Attorney General from any such removal proceedings, the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose.

8 U.S.C. § 1362. Moreover, we have concluded that an alien in removal proceedings, while having no Sixth Amendment right to counsel, has a Fifth Amendment due process right to effective assistance of counsel when counsel has been retained. Dakane, 399 F.3d at 1273.

To establish a claim of ineffective assistance of counsel in the context of a removal hearing, an alien must establish that his or her counsel's performance "was deficient to the point that it impinged upon the fundamental fairness of the hearing such that the alien was unable to reasonably present his or her case." Id. at 1273-74. A petitioner also must show prejudice. Id. at 1274. "Prejudice exists when the performance of counsel is so inadequate that there is a reasonable probability that but for the attorney's error, the outcome of the proceedings would have been different." Id. In addition, a petitioner must show, at least in the context of a

motion to reopen or reconsider, substantial, if not exact, compliance with the following requirements:

> (1) that the motion be supported by an affidavit of the allegedly aggrieved respondent setting forth in detail the agreement that was entered into with counsel with respect to the actions to be taken and what representations counsel did or did not make to the respondent in this regard, (2) that counsel whose integrity or competence is being impugned be informed of the allegations leveled against him and be given an opportunity to respond, and (3) that the motion reflect whether a complaint has been filed with appropriate disciplinary authorities with respect to any violation of counsel's ethical or legal responsibilities, and if not, why not.

Id. (citing Matter of Lozada, 191 I & N Dec. 637, 639 (BIA 1988)).

Rama failed to show that he even substantially complied with the requirements in Lozada with respect to his claim of ineffective assistance of trial counsel. Although Rama mentioned in his motion for remand that his first counsel, Bischoff, failed to present corroborating documents during his asylum hearing, he stated that this failure was based on the fact that, at that time of this hearing, testimony from his family members only would have been considered cumulative. Indeed, Rama's motion for remand was based on his argument that remand was necessary for the IJ to consider "new evidence," that is, that Rama's brother and parents, subsequent to Rama's hearing, had been granted asylum. Moreover, there is no evidence in the record reflecting that Rama submitted an affidavit to the BIA, informed his trial counsel of his allegations, or filed a complaint with the Florida Bar. See Dakane, 399 F.3d at 1274.

23

Similarly, Rama failed to show that he complied with the Lozada requirements with respect to his claim of ineffective assistance of appellate counsel. Rama's motion to reopen was premised on his second counsel's, Brown's, failure to notify him of the BIA's summary affirmance of the IJ's decision, instead of on his present claim that his counsel provided ineffective assistance by failing to file an appellate brief. Moreover, this motion to reopen did not include an affidavit outlining the scope of his appellate counsel's representation or proof that Rama filed a complaint with the Florida Bar.

Even if we were to conclude that Rama met the requirements outlined in Lozada, Rama has failed to establish ineffective assistance of counsel. Because the failure to receive discretionary relief does not amount to a deprivation of a liberty interest, an attorney's deficient representation does not deprive an alien of due process if the inadequate representation only prevents the alien from being eligible for discretionary relief from removal. Mejia-Rodriguez v. Reno, 178 F.3d 1139, 1146-48 (11th Cir. 1999) (eligibility for suspension of deportation); see also Garcia, 329 F.3d at 1223-24 (waiver of excludability). We also have determined that the decision whether to grant asylum is a matter of discretion. See Sepulveda, 401 F.3d at 1231. Thus, even if Rama's appellate counsel's performance was deficient, Rama has failed to show that he was deprived of due process.

24

Furthermore, Rama has failed to show that he was substantially prejudiced by any deficient performance by his trial or appellate counsel. As discussed above, Rama conceded in his motion to remand that the testimony of family members during his asylum hearing, before these family members had been granted asylum, would have been cumulative. To the extent Rama also is arguing that his trial counsel should have introduced documents supporting his testimony, and to the extent he testified at the hearing that proof of his party membership and hospitalization on June 24, 2001, existed, he has failed to explain why, in light of other contradictory evidence offered at this hearing, this proposed testimony would have changed the outcome of the proceedings. See Dakane, 399 F.3d at 1274.

In addition, although counsel's failure to file an appellate brief in the context of an immigration proceeding generally creates a rebuttable presumption of prejudice, see id. at 1274-75, the government has rebutted this presumption by explaining why substantial evidence supported the IJ's adverse credibility determination, see Al Najjar, 257 F.3d at 1283-84. Thus, we conclude that, assuming we have jurisdiction to review Rama's claims of ineffective assistance of counsel, no error occurred.

Accordingly, we conclude that (1) the BIA's summary affirmance of the IJ's decision did not violate Rama's Fifth Amendment due process rights; (2) substantial evidence supported the IJ's adverse credibility finding; and (3) Rama was not

25

denied effective assistance of trial and appellate counsel.  We, therefore, deny

Rama's petition for review.

**PETITION DENIED.**