**PM FARMS, INC., Plaintiff,**

v.

**Michael YOUNG, Acting Secretary, U.S. Department of Agriculture,[1] Defendant.**

**4:15–cv–454–RAW**

United States District Court, S.D. Iowa, Central Division.

1. Michael Young is the Acting Secretary of the Department of Agriculture. Former Secretary Thomas Vilsack resigned on January 13, 2017. Acting Secretary Young is substituted pursuant to Fed. R. Civ. P. 25(d).

Signed 02/08/2017

Brandon J. Buck, Moore McKibben Goodman & Lorenz, LLP, Marshalltown, IA, for Plaintiff.

Rachel J. Scherle, United States Attorney's Office, Des Moines, IA, for Defendant.

## RULING ON JUDICIAL REVIEW

### ROSS A. WALTERS, UNITED STATES MAGISTRATE JUDGE

This is an action by plaintiff PM Farms seeking review of a final determination by the National Appeals Division ("NAD") of the United States Department of Agriculture ("USDA") upholding a $10,000 Graduated Pay Reduction ("GPR") penalty for 2013 crop year violations of Highly Erodible Land and Wetland Conservation ("HELC") regulations applicable to certain fields of PM Farms' land. The case is submitted on the administrative record and briefs. (*See* 8/16/16 Order [15]; 9/27/16

2. The underlying administrative proceedings involved two NAD cases: 2014 E000716 (hereinafter "case 716") and 20150000083

Order [20] ). The matter is before the undersigned pursuant to 28 U.S.C. § 636(c).

## I.

### FACTUAL BACKGROUND AND PROCEDURAL COURSE

Paul and Michelle Veren have farmed in Marshall County, Iowa since the 1980s. The farm has evidently been in the Veren family for many years. At some point the farm was incorporated, as Veren Farms, Inc. and, since 2007, as PM Farms, Inc. (R. 109, 407).[2] Paul Veren is President and Michelle Veren is Vice President. PM Farms has been a USDA program benefit recipient.

The production of agricultural commodities on Highly Erodible Land ("HEL") is governed by USDA's HELC regulations set out in 7 C.F.R. Part 12. To be eligible for USDA program benefits, the production of agricultural commodities on HEL must comply with an approved conservation plan. 7 C.F.R. §§ 12.5(a)(2), 12.7(a).

Veren Farms requested a HEL determination from the Natural Resources Conservation Service ("NRCS"). (R. 264, 265). *See* 7 C.F.R. § 12.6(c)(4). On May 4, 1993 the NRCS issued a determination (the "1993 HEL determination") finding certain farm fields were HEL, while others were not. Specifically, fields 3, 4, 10 and 15 were found to be HEL necessitating a conservation plan, while fields 1, 2, 5, 6, 7, 8, 9, 11, 12, 13, and 14 were found not HEL ("NHEL"). The determination also noted some of the fields were set aside in the Conservation Reserve Program ("CRP") for which a conservation plan would also be required. (R. 264).

At the time of the 1993 HEL determination the farm and tract numbers were

("case 083"). Unless otherwise indicated, all record citations are to the record in the 083 case.

Farm 959 and Tract 2441. (R. 264). Later the farm and tract numbers were changed to what they are now, Farm 6427 and Tract 9562. Fields 5, 6, 7, 8, 11, and 14 of former Tract 2441 (all NHEL) were split off, are not included in Tract 9562 or involved in this litigation. (R. 458, see R. 269). The Farm Service Agency ("FSA") assigned new field numbers to account for changed field boundaries and acreage measurements. The FSA and NRCS use different field numbering systems. The fields in dispute are FSA fields 5 and 7. The same fields are, respectively, NRCS fields 8 and 9. The Administrative Judge and NAD Director tended to use the NRCS numbers in their decisions and the Court will as well.

The farm is comprised of adjoining parcels in sections 5, 8, and 9 of Marietta Township in Marshall County totaling 381.4 acres. (See e.g. R. 193, 248 (indicating acreage), 266–269). The 1993 HEL determination fields 3, 4, 10 and 15 aggregated to 207.5 acres. (R. 264).

The Secretary contends HEL fields 3, 4, 10 and 15 in the 1993 determination are within the boundaries of current NRCS fields 8 and 9. PM Farms does not concede this noting the acreage difference between the 207.5 acres in fields 3, 4, 10 and 15 and the 289.3 acres in fields 8 and 9 on which the FSA calculated the disputed GPR. (See R. 165, 264).[3] The Secretary responds the acreage difference is attributable to the fact PM Farms is now farming land which at the time of the 1993 HEL determination was set aside in the CRP program. (See R. 102–103, 266–269). There is arguably some indication of this in PM Farms' 2008 submission of a HEL certification form which informed FSA of the Farms' intent to tile

through CRP ground in Tract 9562. (R. 102, 103). The 1993 HEL determination was the only HEL determination made by the NRCS prior to the HELC violations at issue.

In December 2011 PM Farms, by Mr. Veren, developed and signed a conservation plan for Tract 9562.[4] The plan included fields 8 and 9. (R. 244–254). Aerial maps associated with the plan identify fields 8 and 9 as HEL. (R. 248, 253, 254). In April 2012 PM Farms was notified NRCS would conduct a compliance review of Tract 9562. (R. 231). The resulting review found PM Farms "actively applied a conservation plan system for 2012 with a temporary variance based on a technical error or incorrect plan." (R. 227). Some excessive soil loss was also noted. (R. 229). In view of the variance, PM Farms was notified the tract would again be reviewed in 2013. (R. 227–229). PM Farms was encouraged to update its conservation plan with the local NRCS office. (R. 227).

No changes were made to the 2011 conservation plan prior to the 2013 planting season. 2012 was a drought year. In the Fall of 2012 PM Farms contracted to have hog manure applied to the fields. Heavy rains occurred in the Spring of 2013 which together with the tracks left by the manure application process caused erosion. Mr. Veren felt he had no way to eliminate gullies and plant the fields unless he field cultivated some of the ground by shallow tillage. (R. 186, 201, 270). He advised the local NRCS office of his plan and was told NRCS could offer no options other than no-till. (R. 179, 270).

Mrs. Veren testified she and her husband had many discussions with the Soil

---

**3.** The conservation plan for PM Farms shows fields 8 and 9 have 158.8 and 125.9 acres of HEL respectively, a total of 284.7. (R. 248). An NRCS soil map shows fields 8 and 9 have

161.4 and 127.9 acres of HEL, a total of 289.3. (R. 249).

**4.** The plan is also referred to in the record as a "Compliance Plan." (See R. 227–229).

Office about their concerns with the unprecedented conditions in 2013 and how to proceed in the right way. The problem as she saw it, and with which other farmers might well agree, was that the rules were "black and white" but farming is not necessarily black and white. She believed that had they followed the rules the erosion would have gotten worse, and they could not have allowed that to happen. (Case 083 audio hearing record commencing 1:01).[5]

PM Farms proceeded to field cultivate parts of fields 8 and 9 as Mr. Veren had informed NRCS. Mr. Veren testified he did not field cultivate non-erodible land, and only cultivated where he needed to because of the erosion. The cultivation violated PM Farms' conservation plan which incorporated a no-till system.

As PM Farms had been advised, a status review was conducted by NRCS in June 2013. The review resulted in a preliminary technical determination that PM Farms was "Not Actively Applying an Approved Conservation Plan or Conservation System" on Tract 9562 because its farming system had resulted in unacceptable soil loss and uncontrolled "ephemeral gully erosion." (R. 189). PM Farms requested reconsideration. Upon reconsideration the NRCS State Conservationist found the preliminary determination was correct and issued a final technical determination that unacceptable soil loss on fields 8 and 9, and uncontrolled ephemeral gully erosion in field 9 demonstrated PM Farms was not applying an approved conservation system (R. 194), a HELC regulation violation.

In 2014 PM Farms appealed the final technical determination to the FSA and at the same time requested that FSA grant good faith relief for the 2013 HELC violation. (R. 185, 186). The FSA referred the matter to the State Conservationist for reconsideration noting PM Farms' explanation that unusual weather conditions had necessitated the offending tillage activities. (R. 180–182). On May 5, 2014 the State Conservationist confirmed the NRCS final determination. (R. 176–177).

On August 12, 2014 the FSA approved PM Farms' request for a good faith exception. The approval meant PM Farms would not lose USDA benefits because of the 2013 HELC violation. *See* 16 U.S.C. § 3812(f)(1). Instead, based on the acreage involved, the FSA calculated a GPR penalty of $26,570 which was reduced to the $10,000 maximum allowed under the regulations. (R. 165–167).

PM Farms appealed both the HELC violation and GPR penalty to the USDA's National Appeals Division ("NAD") which assigned two separate case numbers. *See* n. 2 *supra*. PM Farms did not dispute the fact it did not follow its approved conservation plan in 2013, or the excessive soil loss and gully erosion found by the NRCS. Rather, it argued in case 083 that the drought in 2012 followed by the excessive rain in 2013 made its no-till conservation plan not technically and economically feasible because without cultivation the extensive erosion in the fields would have prevented or unduly hindered planting in 2013. PM Farms relied on the technical requirements in 16 U.S.C. § 3812a(a) which require the Secretary to ensure standards and guidelines permit the use of a conservation system which is "technically and economically feasible." *Id.* subsec. (a)(1). PM Farms also complained that discrepancies in field numbers and maps cast doubt on whether the FSA and NRCS were dealing with the same ground.

In case 716 PM Farms appealed on the basis that the good faith determination and GPR assessment were premature while

---

**5.** The hearing testimony has not been transcribed.

the HELC violation appeal in case 083 was pending. (R. 105 in case 716).

The cases were assigned to NAD Administrative Judge James R. Holman. In the 083 case Judge Holman reversed the FSA decision because the NRCS had not made a HEL determination for fields 8 and 9. The Judge did not address PM Farms' feasibility claim or field number discrepancies complaint finding it unnecessary to do so. (R. 49).

The Administrative Judge did not decide case 716 on the basis presented by PM Farms, that the GPR penalty was premature, and implicitly rejected the argument. Rather, Judge Holman viewed the appeal as "to address the accuracy of the amount of payment reduction imposed" by the FSA. (R. 106 in case 716). He held it was appropriate to find good faith and make a GPR assessment, but that the assessment was not correctly calculated. (R. 108 in case 716). That was because the FSA based its GPR calculation on sheet and rill erosion, and gully erosion. As the Administrative Judge viewed the record, the NRCS found a single violation based on gully erosion in field 9. Regulations set the GPR assessment for gully erosion at $1000 per field and that, the Judge found, was the maximum that could have been assessed. (R. 108, 109).

On May 19 (in case 716) and May 20 (in case 083), 2015, the FSA sought review of the Administrative Judge's decision by the NAD Director. *See* 7 C.F.R. § 11.9. On October 30, 2015 Director Steven C. Silverman reversed both decisions. In case 083 the Director agreed with the FSA that changes in field boundaries and numbers had no effect on the status of farm ground previously determined to be HEL. A new HEL determination for the same farm ground included in the 1993 HEL determi-

nation was not required. The Director addressed and rejected PM Farms' feasibility claim. (R. 83). PM Farms has not sought judicial review of that part of the Director's decision. In case 716 the Director viewed the record as showing the NRCS had found two violations, for excessive soil loss in fields 8 and 9 and ephemeral gully erosion in field 9. So viewed the GPR penalty was correctly calculated.[6] (R. 135, 136). The Director also found that HELC regulations "did not require or permit FSA to determine GPR penalty based solely upon the NRCS's final technical determination" as the Administrative Judge had concluded. (R. 135). It is not necessary to address that issue in this ruling.

On December 7, 2015 PM Farms filed its Complaint seeking judicial review of the NAD's decision.

## II.

### ISSUES AND LEGAL STANDARDS

#### A. The Issues

PM Farms presents four issues for judicial review: (1) the FSA miscalculated the GPR for the reasons given by the Administrative Judge; (2) fields 8 and 9 had not been determined by the NRCS to be HEL after the boundary and field number changes and accordingly the fields were not subject to HELC compliance requirements; (3) the GPR penalty imposed for a HELC violation without a prior determination that the increased acreage in fields 8 and 9 were HEL violated PM Farms' due process rights; and (4) the NAD Director failed to issue a decision within 10 business days after request for review as required by statute. Issues (1) and (2) in substance argue the USDA misapplied or misinterpreted its own regulations. Issues (3) and

**6.** The Director wrote the ephemeral gully erosion finding pertained to field 7 (R. 141). The violation for ephemeral gully erosion was, according to the State Conservationist, as to field 9. (R. 194). Field 7 is the FSA field number for NRCS field 9.

(4) are legal issues. There is very little dispute about the underlying facts, though as to issues (1) and (2) there is some dispute about what the record before the agency showed.

## B. Legal Standards

A final NAD decision is judicially reviewable in accordance with the standards in the Administrative Procedure Act ("APA"). 7 U.S.C. § 6999. The APA in turn provides that upon review of the whole record, or those parts of it cited by a party, the court shall set aside agency action if, as argued here, the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," contrary to constitutional right, "without observance of procedure required by law," or "unsupported by substantial evidence" in the agency record. 5 U.S.C. § 706(2)(A), (B), (D), (E).

 Agency action is arbitrary and capricious if "the agency has . . . offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Siebrasse v. U.S. Dept. of Agriculture,* 418 F.3d 847, 851 (8th Cir. 2005) (quoting *Mausolf v. Babbitt,* 125 F.3d 661, 669 (8th Cir. 1997) in turn quoting *Motor Vehicle Mfrs Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). Courts accord deference to an "agency's interpretation of the statutes and regulations it administers," *id.* at 851, unless the "regulation is contrary to unambiguous statutory language, that the agency's interpretation of its own regulation is plainly erroneous or inconsistent with the regulation, or that the application of the regulation [is] arbitrary and capricious." *Nack v. Walburg,* 715 F.3d 680, 684 (8th Cir. 2013) (quoting *J & K Market Centerville, L.L.C.,* 679 F.3d 709, 712 (8th Cir.

2012) in turn quoting *Ballanger v. Johanns,* 495 F.3d 866, 872 (8th Cir. 2007)(bracket original to *J & K Market* ).

 The party challenging agency action on the ground it was not supported by substantial evidence has the burden to demonstrate that is the case. *Payton v. U.S. Dept. of Agriculture,* 337 F.3d 1163, 1169 (10th Cir. 2003). "Substantial evidence is 'less than a preponderance but is enough that a reasonable mind would find it adequate to support' the decision." *Fredrickson v. Barnhart,* 359 F.3d 972, 976 (8th Cir. 2004) (quoting *Krogmeier v. Barnhart,* 294 F.3d 1019, 1022 (8th Cir. 2002)); see *Groenendyk v. Johanns,* 2008 WL 428157, *5 (S.D. Iowa, Feb. 12 2008) (citing *Fredrickson* ). A court may not substitute its judgment for that of the agency factfinder merely because the evidence would support a different conclusion, or the court might disagree with the agency. *Menendez–Donis v. Ashcroft,* 360 F.3d 915, 918 (8th Cir. 2004).

Where, as here, the NAD Director has overturned the Administrative Judge's decision, the issue is not whether the Judge's decision was supported by substantial evidence, but whether substantial evidence supports the NAD Director's decision. See *Payton,* 337 F.3d at 1169. Similarly, the analysis for arbitrary and capricious decision-making focuses on the Director's decision. *Id.* The Administrative Judge's decision is not irrelevant, but it is the Director's decision that is under review.

## III.

## DISCUSSION

The Court will take up the judicial review issues in the order presented by PM Farms.

## A. The GPR Calculation

██ Resolution of this issue assumes a HELC violation for if, as the Administrative Judge found in case 083, there was no HELC violation there could be no penalty.

The Administrative Judge determined the maximum GPR penalty which could have been assessed was $1000 based on the ephemeral gully erosion in field 9 because that was the only type of erosion specifically identified in the NRCS technical determination. The Director reversed in the belief the NRCS had found two separate violations, the first for excessive soil loss in fields 8 and 9, and the second for the ephemeral gully erosion in field 9. (R. 135). The Director appears to have viewed the first violation as the product of sheet and rill erosion. (*Id.*)

The record substantially supports the Director's conclusion that the NRCS found two violations, though it may be more accurate to say the NRCS found two reasons for its HELC violation determination. (R. 194). PM Farms' farming system resulted in soil loss which exceeded the soil loss "of an acceptable conservation system" in fields 8 and 9, the first reason, "and/or" ephemeral gully erosion was not controlled in field 9, the second. (*Id.*) The NRCS did not specify the type of erosion which caused the excessive soil loss in fields 8 and 9. The issue is whether that failure prevents imposition of a penalty for the excessive soil loss.

In determining GPR the FSA applied a provision in its handbook at 6—CP § 621E entitled "GPR Calculation." (R. 243, 244 in case 716; R. 165). The provision recognizes only two types of erosion, "sheet and rill erosion" and "gully erosion." The GPR for sheet and rill erosion is based on the amount of soil loss. The GPR for gully erosion is a flat $1000 per field. In an accompanying "note" the provision explains:

> NRCS determines the type of erosion, erodibility index, actual soil loss, and acres or fields in violation of HELC provisions. Fields with both sheet and rill erosion and gully erosion shall have GPR based upon the higher of the 2 methods.

(R. 243 in case 716).

The FSA based its calculation on the "Amount per Acre for Sheet and Rill Erosion" in both fields under the handbook formula laid out under that heading. (R. 243 in case 716). It thus considered the soil loss in fields 8 and 9 was due to sheet and rill erosion. Indeed, the FSA argued before the Director that the NRCS's determination of excessive soil loss amounted to a finding of sheet and rill erosion. (R. 117 in case 716). In brief testimony on the subject in case 083, NRCS representative Don Carrington referred to the erosion in fields 8 and 9 as sheet and rill erosion. (Case 083 audio hearing record 1:27, 1:30).[7]

Statute and rule require that GPR must be based on technical information from the NRCS, *see* 7 U.S.C. § 6932(d)(2)(A); 7 C.F.R. § 12.6(b)(3)(ix), but the FSA retains a measure of discretion in determining the amount of the benefit reduction. The amount is to be "commensurate with the seriousness of the violation" and determined "based on the number of acres and the degree of erosion hazard for the area in violation, as determined by NRCS, or upon such other factors as FSA determines appropriate." 7 C.F.R. § 12.5(5)(iv).

The NRCS did not use the words "sheet and rill erosion," but that did not preclude the FSA from considering that type of

---

7. No separate testimony appears to have been taken in case 716. PM Farms' relied on the testimony in case 083 which the Administrative Judge accepted because the cases were intertwined. (Case 716 audio hearing record 3/12/15) 4:00, 5:37, 10:09). The Court has considered the testimony in case 083 in reviewing the decision in case 716.

erosion to be implicit in the NRCS finding of excessive soil loss. The FSA thought sheet and rill erosion was involved. Its GPR determination was in line with the handbook formula for sheet and rill erosion. The NRCS's Mr. Carrington refereed to it as such. No other kind of erosion is suggested as a possible cause for the excessive soil loss in fields 8 and 9. The handbook identifies only two kinds of erosion in the GPR calculation; sheet and rill, and gully.

PM Farms has not shown the NAD Director's decision upholding the GPR amount was unsupported by substantial evidence, was arbitrary and capricious or an abuse of discretion, or in violation of regulation or statute.

## B. HEL Determination for Fields 8 and 9

■ The issue here boils down to whether a HEL determination for new fields 8 and 9 after the field number and boundary changes was required for enforcement of HELC regulations with respect to previously determined HEL areas in those fields. The Administrative Judge held a new determination with notice to PM Farms were essential prerequisites. The Administrative Judge appeared to view NRCS fields 8 and 9 in current Tract 9562 as the same fields 8 and 9 in former Tract 2441. (R. 78, 82, 138). The latter were found NHEL in the 1993 HEL determination. (R. 264). The Administrative Judge reasoned that for the fields to be subject to HELC regulations a new determination finding them as HEL had to have been made.

The NAD Director reversed. He held fields 8 and 9 at issue were not the same fields 8 and 9 in the 1993 HEL determination, and that HEL areas listed in the 1993 HEL determination, fields 3, 4, 10 and 15, were within the boundaries of new fields 8

and 9. (R. 138). The regulations did not require new HEL determinations when the field numbers and boundaries were changed. (R. 139).

There is substantial support in the record and governing regulations for the Director's decision that field number and boundary changes did not require a HEL determination specific to new fields 8 and 9. To begin with, the Director's finding that fields 8 and 9 were not the fields 8 and 9 in the 1993 HEL determination is clearly supported in the record. There was some confusion at the hearing in case 083 in the responses by the FSA and NRCS representatives to the Administrative Judge's questions about NHEL fields 8 and 9 in the 1993 HEL determination in relation to fields 8 and 9 in which the HELC violation at issue was found, but the FSA's post-hearing exhibit 1 [8] clarifies that new fields 8 and 9 are a combination and realignment of Tract 2441 fields identified in the 1993 HEL determination, and that the field boundaries in Tract 9562 had changed significantly from those in the 1993 determination. Annotations on aerial photographs associated with the 1993 HEL determination indicate no part of old field 8 (one of the split off fields, see supra at 2) is a part of new field 8. (See R. 267–269). Old field 9 is only one of four fields forming new field 9. (See R. 268, 458). The fields are not the same.

Generally, subject to a good faith exemption, a person is ineligible for USDA program benefits if the person produces an agricultural commodity in a field in which highly erodible land is predominant, unless the commodity is produced in compliance with an approved conservation plan or system. 16 U.S.C. § 3811(a); 12 C.F.R. §§ 12.4(a)(1), .5(a)(2). The NRCS is charged with determining whether highly erodible land is predominant in a field, and

---

8. The Administrative Judge held the record

open for post-hearing exhibits. (R. 77).

will make that determination in response to a written request on Form AD–1026. 12 C.F.R. §§ 12.6(c)(2)(ii), (4). PM Farms' corporate predecessor, Veren Farms, made such a request in 1993 as a result of which it was determined that then field numbers 3, 4, 10 and 15 totaling 207.5 acres were HEL. (R. 264).

The Court has not been referred to any regulation which requires a new HEL determination when field numbers and boundaries change. To the contrary, as the Director noted, the regulations include a provision which expressly addresses the "[i]mpact of changing field boundaries."

> When field boundaries are changed to include areas of land that were included in a field that was previously determined to be predominately highly erodible according to paragraph (a) of this section, such areas shall continue to be subject to the requirements for predominately highly erodible fields, except as provide in paragraph (b) of this section.

12 C.F.R. § 12.22 (c). "[P]aragraph (b)" in turn permits a person to request a modification of field boundaries to exclude highly erodible land from a field. *Id.* § 12.22 (b). A person may also request a HEL determination in light of field number and boundary changes by submitting a new Form AD–1026. The FSA may request, or the NRCS itself may initiate a "HELC Compliance Determination" which may result in a new HEL determination. (R. 191, 459). But absent one of these things, areas determined by NRCS to be primarily HEL remain subject to HELC regulations notwithstanding subsequent boundary changes and, it would follow, accompanying new field numbers. This regulatory framework appears to be consistent with the statute.

PM Farms' 2011 conservation plan included fields 8 and 9 and identified them as HEL. Mr. and Mrs. Veren are experienced, responsible farmers. Mr. Veren testified they have farmed a no-till system since about 1985, uncommon for the time. They have done so to protect their land from erosion. The Verens know what HEL land is because they farm a lot of it. It is a reasonable inference from the record that the Verens have long understood that fields 8 and 9 are predominantly HEL. According to the FSA, a post-hearing analysis of the erodibility index for soils on PM Farms' Soils Inventory report (R. 255–258) shows that fields 8 and 9 meet the criteria for highly erodible fields and are subject to conservation compliance requirements. (R. 458–460).

The Director opined that maps and aerial photographs show that old HEL fields 3, 4, 10 and 15 are within the boundaries of new fields 8 and 9. (R. 132). The Director in his decision, and the Secretary in his judicial review brief, suggest this can be seen when post-change aerial photographs and soil maps of fields 8 and 9 (R. 192, 193, 211, 249–252; see R. 132 (Dir. decision), Def. Brief [21] at 10–11) are compared with the aerial photographs (and annotations on them) associated with the 1993 HEL determination. (R. 266–269). It takes some looking, but these documents do support the contention that old fields 3, 4, 10, and 15 are in new fields 8 and 9. The 1993 aerials are grainy photocopies, but they are clearly labeled by section number and the farm boundary is marked by bold outline. The annotations on them appear to show fields referred to in the 1993 HEL determination and the acreage of each field. Then as now the HEL areas are entirely within two adjoining quarter sections of Marietta Township sections 8 and 9 (legal description, not field numbers). (*Compare* R. 248, 249 *with* R. 267, 268). Except for one small field and some farm buildings, nearly all of the ground in the section 8 quarter section, 141.2 acres, was in HEL field 3 listed in the 1993 HEL determination. (R. 267). Old field 3 now

comprises most of new field 8 which conservation plan maps for PM Farms show to have 158.8 HEL acres. (*See* R. 248, 253). HEL fields 4, 10 and 15 in the 1993 HEL determination are in the section 9 quarter section. (R. 268). Those fields would have totaled 66.3 acres of the total 207.5 acres of HEL in the 1993 determination (207.5 less 141.2). Old HEL fields 4, 10 and 15 are now in new field 9 which according to the PM Farms conservation plan maps has 125.9 HEL acres. (*See* R. 248, 253).

The HEL acres in the 1993 HEL determination have, according to the more recent conservation plan and soil maps, increased by about 80 acres. Most of the increase is in field 9. Why is not clear. The total farm acreage has not changed. The difference could in part be explained by CRP ground being put in production as the Secretary contends. It could also be that over time the FSA, NRCS and the Verens have treated more of the ground as HEL in conservation planning. Ultimately neither the difference nor the reason for it is material.

As the appellant PM Farms had "the burden of proving that the adverse decision of the agency was erroneous by a preponderance of the evidence." 12 C.F.R. § 11.8(e). PM Farms complained about the multiple and confusing field numbers used by the FSA and NRCS, but the evidence it offered at hearing was almost entirely focused on its claim that the double blow of extreme drought in 2012 followed by severe rains in the Spring of 2013 made PM Farms' no-till conservation plan not technically and economically feasible in 2013. As noted, the NAD Director's rejection of that claim is not before the Court. The issue of new post-field and boundary change NRCS HEL determinations for fields 8 and 9 was raised by the Administrative Judge in questions to the NRCS and FSA representatives at the end of the hearing. Consequently, there is not much evidence on the subject beyond the FSA's post-hearing exhibit referred to previously, coupled with what can be gleaned from the aerial photographs and maps in the record.

It appears old HEL fields 3, 4, 10 and 15 in the 1993 HEL determination were included in new field 8 and 9 after the field number and boundary changes. By regulation the HEL areas identified in the 1993 determination continued to be subject to HELC regulations. Analysis conducted in conjunction with the administrative proceedings confirms that fields 8 and 9 meet the criteria for HEL fields. Fields 8 and 9 were HEL fields in the conservation plan for PM Farms and understood as such by the Verens. The total acreage of the HEL fields has increased, but that found in the 1993 HEL determination predominates. It follows the Director's decision upholding the NRCS final technical determination of HELC violations was not erroneous for want of a subsequent determination that new fields 8 and 9 contained HEL. The decision in this regard is supported by substantial evidence, was not arbitrary and capricious, an abuse of discretion, or in violation of regulation or statute.

## C. Due Process

■ The Due Process Clause of the Fifth Amendment to the U.S. Constitution states that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const., amend. V. This case involves a reduction in USDA benefit payments. The Secretary does not dispute that PM Farms has a property interest in the benefits or that due process must be satisfied before the benefits are reduced. That being the case, due process at its most fundamental level requires notice and an " 'opportunity to be heard 'at a meaningful time and in a meaningful manner.' " *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (quoting

*Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)); *see Board of Regents v. Roth*, 408 U.S. 564, 570 n. 8, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (citing *Bell v. Burson*, 402 U.S. 535, 542, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971)); *Raymond v. Board of Regents of Univ. of Minn.*, 847 F.3d 585, 589 (8th Cir. Jan. 31, 2017); *Wong v. Minn. Dept. of Human Services*, 820 F.3d 922, 935 (8th Cir. 2016).

 PM Farms' due process claim is focused on the approximate 80 acre expansion of HEL field acres from the 207.5 found in 1993 HEL determination to the 289.3 used in the GPR calculation. (R. 165). PM Farms argues the NRCS's failure to make a determination with respect to the expanded HEL areas deprived it of notice the acres had increased and an opportunity to appeal the increase as permitted by 7 C.F.R. § 12.6(c)(9). As a result, PM Farms says, it was "deprived of payment to which it is entitled because of the expansion of acres subject to compliance without a determination by the NRCS." (Pl. Br. [16] at 12).

PM Farms did not suffer a deprivation of benefit payments because the GPR calculation included the 80 acre expansion of HEL. Had the penalty been calculated only on the 207.5 HEL field acres in the 1993 determination the penalty would have been the same. As discussed previously, the HEL areas in the 1993 determination are now in NRCS fields 8 and 9, 141.2 acres in field 8 and 66.3 acres in field 9. *See supra* at 15. If the field acres in violation are reduced to 141.2 in field 8 and 66.3 in field 9 those figures times the GPR per acre penalty rate used by the FSA ($125 for field 8, $50 for field 9), would have yielded a "Calculated GPR Penalty" of $20,965 (141.2 x $125 + 66.3 x $50) rather than the $26,570 (161.4 x $125 + 127.9 x $50) in the FSA calculation, still well above

the $10,000 maximum which would have been assessed. (R. 165).[9]

The inability to appeal a determination not made was not a due process violation. PM Farms knew, or should have known, of the HEL field acres listed in the 1993 determination and of their location. PM Farms knew the amount of the HEL field acres in its conservation plan and their location. PM Farms has not claimed the acreage was excessive. The Verens would have known if it were. They were thoroughly familiar with the ground having farmed it no-till for many years. If at any time PM Farms had any reason to question the amount of HEL it could have requested a new determination from the NRCS and appealed if dissatisfied with the result.

 There was no due process violation in connection with the administrative proceedings. Before the imposition of any penalty PM Farms was informed of the alleged violations found by the NRCS in fields 8 and 9. PM Farms requested reconsideration. When that failed it appealed to the FSA and sought good faith relief. It succeeded in obtaining the relief and was assessed a GPR penalty in lieu of benefit ineligibility, but the FSA confirmed the violations. PM Farms exercised his right to appeal both the violation findings and the GPR to the NAD. Hearings were held on both matters before an impartial Administrative Judge at which PM Farms was represented by counsel. PM Farms had the opportunity to, and did, offer evidence and argument at the hearings, and cross-examine the FSA and NRCS representatives. It obtained favorable decisions from the Administrative Judge which the agency successfully appealed to the NAD Director. Now PM Farms has exercised its right to judicial review. PM Farms re-

9. The FSA GPR calculation used the FSA field numbers, 5 and 7. *See supra* at 2.

ceived notice of the HELC violations and penalty, and had an opportunity to challenge both in a meaningful manner.

## D. Timeliness of Director's Decision

■ The FSA requested review of the Administrative Judge's decision on May 19, 2015 (in case 716) and May 20, 2015 (in case 083). (R. 115 in case 716, 90). In the case of an agency request for review, the statute states that the Director "shall" complete the review and issue a final determination "not later than ... 10 business days after receipt of the request ...." 7 U.S.C. § 6998(b)(1). The Director issued his decision in both cases on October 30, 2015, nearly five months after it was due. PM Farms argues the untimeliness of the decision warrants setting it aside under the APA as made "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

A significant body of case law has developed which holds that, ordinarily, a statute mandating decision or action by an agency or public official within a specified time period does not void action taken or decision made after the prescribed time period, or negate jurisdiction, unless the statute creating the deadline specifies the consequence for non-compliance. In other words, in most cases non-compliance with a timing provision carries no sanction unless the statute provides one.

*Brock v. Pierce County*, 476 U.S. 253, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986) involved a provision in the Comprehensive Employment and Training Act (CETA), 29 U.S.C. § 816(b) which required the Secretary of Labor to investigate complaints or information that a grant recipient was misusing CETA funds, and directed the Secretary "shall" determine the truth of the matter not later than 120 days after receiving a complaint. The Secretary's determination disallowing certain costs had been made long after the 120 day period.

The question was whether the tardiness deprived the Secretary of the power to recover the misused CETA funds. (*Id.* at 254–55, 256–57, 106 S.Ct. 1834). The court held it did not. The court noted a line of courts of appeals precedent holding that agency failure to comply with statutory time limits does not deprive the agency of jurisdiction "unless the statute *'both* requires the agency or public official to act within a particular time *and* specifies the consequence for failure to comply' ". *Id.* at 259, 106 S.Ct. 1834 (internal citations omitted, emphasis original). The court went on to say it "would be most reluctant conclude that every failure of an agency to observe a procedural requirement voids subsequent agency action, especially when important public rights are at stake." *Id.* at 262, 106 S.Ct. 1834.

Later, in *United States v. Montalvo–Murillo*, 495 U.S. 711, 110 S.Ct. 2072, 109 L.Ed.2d 720 (1990), a case involving violation of the prompt hearing provision in the Bail Reform Act, 18 U.S.C. 3142(e), the court cited *Brock* in holding the word "shall" imposing the time requirement did not operate to bar pretrial detention after the time limit had passed. *Id.* at 718, 110 S.Ct. 2072.

At issue in *United States v. James Daniel Good Real Property*, 510 U.S. 43, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993) was the government's failure to comply with a statutory timing requirement in connection with a forfeiture action. The court characterized *Montevalo–Murillo* and *Brock* as holding "if a statute does not specifically specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction. *Id.* at 63, 114 S.Ct. 492.

The court revisited the issue of agency action timeliness in *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 123 S.Ct. 748, 154

L.Ed.2d 653 (2003) which involved a federal statute directing that the Commissioner of Social Security "shall before October 1, 1993" assign responsibility for coal industry retiree benefit payments. The Commissioner made the assignments after the deadline. The affected companies argued the statute set a time limit on the Commissioner's power to make the assignments. *Id.* at 156, 123 S.Ct. 748. In rejecting the argument the Supreme Court repeated what it had said in *James Daniel Good* was the take away from its opinions in *Brock* and *Montalvo–Murillo, id.* at 159, 110 S.Ct. 2072, adding that *Brock*'s example "has to mean that a statute directing official action needs more than a mandatory "shall" before the grant of power can sensibly be read to expire when the job is supposed to be done." *Id.* at 161, 123 S.Ct. 748.

Finally, in *Dolan v. United States*, 560 U.S. 605, 130 S.Ct. 2533, 177 L.Ed.2d 108 (2010) the Supreme Court described the line of cases from *Brock* to *Barnhart* as pertaining to a class of cases in which "a deadline seeks speed by creating a time-related directive that is legally enforceable but does not deprive a judge or other public official of the power to take the action to which the deadline applies if the deadline is missed." *Id.* at 611, 130 S.Ct. 2533. The deadlines in § 6998(b) are just such speed seeking deadlines.

Appellate courts, including the Eighth Circuit, have looked to the holdings in *Brock* and its progeny in a variety of contexts where a statute directed an agency "shall" act within a specified time but the agency failed to do so. *See e.g. National Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145, 152, 154–56 (D.C. Cir. 2010) (missed deadline to promulgate revised regulations pertaining to renewable fuels did not deprive EPA of authority to act); *Cyberworld Enter. Tech., Inc. v. Napolitano*, 602 F.3d 189, 196–98 (3d Cir. 2010) (missed 30 day deadline (by 18 months) to determine if a reasonable basis for complaint pertaining to visa requirements did not prevent Homeland Security Secretary from acting); *United States v. Balentine*, 569 F.3d 801, 803, 807 (8th Cir. 2009) (missed deadline for entry of restitution order did not divest court's authority to order restitution); *Kinion v. United States*, 8 F.3d 639, 643–44) (8th Cir. 1993) (missed deadline for debt restructuring and loan servicing decisions did not deprive FmHA of jurisdiction).

PM Farms refers the Court to three district court cases involving the NAD Director's failure to issue a decision within the § 6998(b) time periods. An NAD appeal of denied disaster payments was involved in *Passarell v. Glickman*, 1997 WL 118407 (D.D.C. March 6, 1997). The NAD Director had not made a decision within the 30 day period for appellant requests for review. The Secretary argued the 30 day period was "aspirational." The court rejected that characterization, found "shall" meant mandatory, and held the Secretary's construction of the 30 day period as aspirational was arbitrary and capricious as well as a violation of the statute. *Id.* at *2, 3. The opinion did not discuss any of the relevant Supreme Court case law in existence at the time and for that reason *Passarell* has little persuasive value.

*Beard v. Glickman*, 189 F.Supp.2d 994 (C.D. Cal. 2001) involved rejection of a CRP bid. The Director reversed the hearing officer's [10] decision in favor of the farmers, but did not do so within the 10 day time period for agency requests for review.

---

**10.** The title of NAD hearing officers was changed in 2014 to "Administrative Judge."

(*see* R. 126 n. 1).

The farmers argued the untimely decision was in excess of the Director's statutory jurisdiction and without observance of procedure thus the APA required that the decision be set aside. *Id.* at 999. Citing *Brock* and like cases discussed above, the court held that in the absence of a specified consequence in the statute for noncompliance with the deadline it would not impose an independent sanction. *Id.* The court implicitly rejected the farmers' argument based on the APA. The court's decision also appears to have been influenced by the brevity of the delay (a matter of days) and the fact the Director did not receive the farmers' review response until after the 10 day deadline.

Finally, in *PAB Bankshares, Inc. v. Johanns*, 2007 WL 934612 (M.D. Ga. March 26, 2007), closer to the temporal circumstances in this case, the NAD Director issued his determination on an appellant's request for review some two and a half months beyond the 30 day statutory time period. *Id.* at *1. At issue was a USDA loan guarantee. *Id.* The disappointed bank sought judicial review claiming, among other things, that the Director's determination "was made without observance of procedure required by law and should be set aside pursuant to 5 U.S.C.A. § 706(2)(D)." *Id.* at *2. The court noted the statute was silent with respect to the consequences of the Director's failure to complete the review and determination within the specified time and held that setting aside the Director's determination solely because of that failure would be inconsistent with the Supreme Court's reasoning in *Brock*. *Id.* at *4. The court concluded its timeliness discussion by observing that without creating a remedy or sanction for a failure to comply with § 6998(b) "Congress has created a statutory deadline that is of little or no meaning," but the problem was for Congress, not the court to fix. *Id.* at *5.

In this case the Director did not comply with the statutory requirement that a final determination on the FSA's request for review be made not later than 10 business days after receipt of the request. 7 U.S.C. § 6998(b)(1). The determination was beyond time by nearly five months. While the statute imposes a mandatory duty by use of the word "shall," it does not specify a consequence for noncompliance. That NAD decisions are reviewable under the much older APA does not fill the void. The APA does not specify a consequence for noncompliance with the § 6998(b) timing requirements. The APA's "without observance of procedure" provision in § 706(2)(D) is broadly worded in keeping with its general applicability to a wide range of judicial review proceedings. It does not say anything about the timeliness of agency decisions much less specify a consequence if a decision, otherwise procedurally correct, is not timely issued. As noted above, two other courts faced with the same issue have, with little or no discussion of the APA to be sure, rejected the argument that § 706(2)(D) supplies a consequence for the NAD Director's tardy decision-making where § 6998 does not. *See Beard*, 189 F. Supp. 2nd at 989–1001; *PAB Bankshares*, 2007 WL 934612 at *2–5. To set aside the Director's decision on the ground of procedural aberrance under the APA solely on the basis the decision was not made within the § 6998(b) time period would be inconsistent with the body of case law which specifically deals with agency/public official non-compliance with statutory timing provisions.

The command "shall," standing alone, did not deprive the Director of authority to act beyond the specified time. *Barnhart*, 537 U.S. at 161, 123 S.Ct. 748; *Brock*, 476 U.S. at 262, 106 S.Ct. 1834. The issue then becomes whether the evident purpose, structure and context of the statute, together with the attendant circumstances,

takes this case out of the norm in which agency noncompliance with a statutory timing provision does not void agency action. For three reasons the Court does not believe that sanction should be inferred. First, completion of the review process and issuance of a decision within the 10 or 30 day time period would in some cases be a practical impossibility to accomplish on a reasoned basis suitable for judicial review if the administrative record is lengthy, complex or the appeal presents difficult issues. The USDA recognized as much in responding to comments on the proposed regulation governing Director review of hearing officer decisions, 7 C.F.R. § 11.9. Some had expressed concern the Director would not be able to address all arguments "in the rush to meet the statutory deadlines for issuing determinations." Rules and Regulations, Department of Agriculture, 60 Fed. Reg. 67305 (December 29, 1995). The USDA addressed the concerns as follows:

> [T]he deadlines set by the Act for the Director to issue a final determination ... may be unrealistic at any given time because of the caseload or the complexities of a particular appeal.... Hastily rendered determinations that fail to develop an adequate decision for judicial review do not benefit either USDA or applicants."

*Id.* The Department said it would follow the deadlines to the extent possible recognizing there may be occasions when the Director would need to take additional time. It did not view the deadlines as jurisdictional. *Id.*

Congress set a very tight time frame in an obvious effort to speed the Director review process. Congress must, however, have known there would be circumstances in which compliance could not be met. If it meant the deadlines to be ironclad, with no exceptions, it could have provided for enforcement by removing the Director's authority to make a decision after expiration of the applicable time period. That it did not is an indication Congress did not intend to deprive the Director of the authority to make decisions after the deadline.

Second, § 6998 was enacted eight years after the Supreme Court's decision in *Brock* "when Congress was presumably aware that [courts] do not readily infer congressional intent to limit an agency's power to get a mandatory job done merely from a specification to act by a certain time." *Barnhart*, 537 U.S. at 160, 123 S.Ct. 748. The omission of a provision limiting the Director's authority to issue determinations after the deadlines, given the state of the law at the time, is a further indication that no such restriction was intended.

Third, and finally, there is an obvious public interest, grounded in statute, in the enforcement of agricultural land use regulations pertaining to the farming of highly erodible land, as well as the broader field of issues which may impact participants and the public in the administration of agricultural programs. The cases instruct that the Court should be reluctant to infer the Director's failure to make a decision within the restrictive time periods deprives the Director of the authority to perform the Director's function of making final determinations of issues of public import. *See Brock*, 476 U.S. at 260, 106 S.Ct. 1834; *Beard*, 189 F.Supp.2d at 1000. Those like PM Farms who are adversely affected by decisions made at the local level also have an interest in an administrative appellate process which gives full attention to their arguments. This case could have been the other way around had the Administrative Judge found for the FSA, PM Farms sought Director review, and the Director lost authority to consider PM Farms' appeal after the 30–day period for appellant requests for review, or hastily reached an adverse decision in order to comply with the 30–day period. If, on the other hand,

the Director made a decision in favor of PM Farms months after expiration of the 30–day period, the Court suspects no one would argue the decision should be set aside as procedurally infirm.

In this case the Director was reviewing two related cases together involving hundreds of pages of record, as well as hearing testimony. Resolution of the GPR calculation issue and tracing the HEL history in what are now fields 8 and 9 took careful attention to the record. In the circumstances, adequate consideration of the review issues and time necessary for preparation of a decision reasonably took longer than 10 business days. The Court is not in a position to fix a date after which the delay became unreasonable, if it ever did. PM Farms was not prejudiced by the delay.

In the absence of a statutory requirement, the Director's decisions under review will not be set aside as procedurally deficient for failure to complete the review process and make a final determination within the ten-day time period of § 6998(b)(1).

## IV.

### CONCLUSION AND ORDER

Plaintiff PM Farms has not established any basis to set aside the NAD Director's decisions in the two administrative proceedings under review. The decisions are affirmed. The Clerk shall enter judgment dismissing the Complaint.

IT IS SO ORDERED.

